NATIONWIDE MUTUAL FIRE INSURANCE COMPANY et al., Appellants,

v.

SONITROL, INC. OF CLEVELAND et al., Appellees.

[Cite as *Nationwide Mut. Fire Ins. Co. v. Sonitrol, Inc. of Cleveland* (1996), 109 Ohio App.3d 474.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 68583 and 68584.

Decided Feb. 20, 1996.

---

*Marillyn Fagan Damelio* and *Jennifer L. Vinciguerra,* for appellants.

*Roy A. Hulme* and *Clifford C. Masch,* for appellee Sonitrol, Inc. of Cleveland.

*Brian M. Eisenberg,* for appellee U.S. Protective Services Corp.

NAHRA, Presiding Judge.

In these consolidated cases, plaintiffs-appellants Nationwide Mutual Fire Insurance Company ("Nationwide") and the North Olmsted City School District Board of Education ("the board") appeal from the trial court orders which granted the motions for summary judgment filed by defendants-appellees Sonitrol, Inc. of Cleveland and U.S. Protective Services Corporation (collectively, "Sonitrol").[1]

These appeals stem from a fire which devastated North Olmsted High School on September 16, 1990. It was later determined that the fire had been started by two juveniles who first broke into the school building through an office window at approximately 3:00 a.m. of that morning. The juveniles spent some time ransacking the office, climbed through the broken window, broke another office window, reentered the building, and then spent more time vandalizing the second office. The juveniles eventually left the school building through the second window, but before leaving they deposited a lit cigarette near an overturned oil lamp. The fire which resulted was ultimately discovered at approximately 6:00 a.m. by a North Olmsted police officer. By the time the fire was extinguished, the school building had suffered over $3 million in damage.

---

**1.** Appellees are referred to in the singular because the record reflects that in mid–1990, U.S. Protective Services Corporation became a successor to Sonitrol, Inc. of Cleveland.

The board had an insurance policy with Nationwide which applied to cover the fire damage to the high school building. The board was forced, however, to incur additional expenses during the time the building was unusable in order to continue to provide the required educational services to the community.

Prior to the fire, the high school building had been equipped with a security system originally purchased by the board from Sonitrol in the early 1980s. Sonitrol also installed and monitored the system, which was designed to detect burglaries.

Throughout the time that the system was in use, it was occasionally altered to the board's specifications. The most recent contract between the parties regarding the system had been executed in March 1988 and was for a term of three years. At its outset, the contract provided that Sonitrol would install and service a burglary alarm system "without liability and not as an insurer." The system to be installed was subject to a limited warranty.

The initial terms of the limited warranty were set forth in capital letters, followed by an underscored provision indicating that Sonitrol would "not be liable for any general, direct, * * * incidental or consequential damages." Indeed, that Sonitrol's *liability* was limited was repeated several times in the language of the limited warranty. The warranty's terms further indicated the Board's acknowledgment that Sonitrol had not represented that the system "may not be compromised, circumvented or * * * will in all cases provide the signaling, monitoring and response for which it was intended."

After setting forth the terms of the limited warranty, the contract provided that if Sonitrol received from the system a signal indicating that a burglary was occurring, Sonitrol's operator would "make every reasonable effort to identify the signal, and when warranted" would notify both the local police department and the designated representatives of the board. Moreover, the board agreed to hold Sonitrol harmless from "any damage, loss or liability" which might result if Sonitrol in its discretion deemed it necessary to turn *off* the alarm for some reason.

Paragraph 14 of the contract further provided the following:

"14. A. It is understood and agreed by the parties hereto that *DEALER is not an insurer* and that *insurance, if any,* covering personal injury and property loss or damage on CLIENT'S premises *shall be obtained by CLIENT;* that the *payments provided for herein are based solely on the value of the service as set forth herein and are unrelated to the value of CLIENT'S property or the property of others located on CLIENT's premises; that DEALER makes no guarantee * * *.*

"B. *CLIENT acknowledges it is impractical and extremely difficult to fix the actual damages, if any, which may approximately [sic] result from a failure to perform any of DEALER'S obligations or a failure or malfunction in the system to properly operate because of, among other things: the uncertain amount or value of CLIENT'S property or the property of others* which may be lost or damaged; the uncertainty of the response time of the police or other authority; *the inability to ascertain what portion, if any, of any loss would be approximately [sic] caused by DEALER'S failure* to perform any of its obligations *or failure of its equipment* to properly operate; the nature of the services to be performed by DEALER.

"C. CLIENT understands and agrees that if DEALER should be found liable for any loss or damage due from a failure to perform any of its obligations or a failure of the equipment to properly operate, *DEALER'S liability shall be limited to a sum equal to the total of one-half year's monitoring payments, or five hundred dollars, whichever is the lesser, and this liability shall be exclusive,* and shall apply if loss or damage, *irrespective of cause or origin,* results directly or indirectly to persons or property *from performance or non-performance of any of DEALER'S obligations or from negligence, active or otherwise, of DEALER, its employees and agents.*

"D. *In the event that the CLIENT wishes DEALER to assume greater liability, CLIENT may, as a matter of right, obtain from DEALER a higher limit by paying an additional amount to DEALER * * *.* (Emphasis added.)

The final portion of paragraph 14 indicated the board's understanding that at its request, it could purchase "additional protection" to augment the burglary alarm system.

Finally, paragraph 16 of the agreement stated as follows:

"16. *CLIENT acknowledges* that the provisions of this Agreement, and *particularly those paragraphs relating to* disclaimer of warranties, *limitation of liability* and third-party indemnification, *inure to the benefit of and are applicable to Sonitrol Corporation* and its subsidiaries and to any subcontractors engaged by DEALER to provide monitoring, maintenance, installation or service of the alarm system provided herein, *and bind CLIENT to Sonitrol* Corporation and its subsidiaries and to said subcontractors, or to the Department or other authority to which the alarm may be transmitted, *with the same force and effect* as they bind CLIENT to DEALER. *CLIENT hereby waives his right of recovery for any loss covered by insurance on the premises or its contents to the extent permitted by any policy or by law.*" (Emphasis added.)

As installed before the date of the fire, the security system protected certain specified areas of the building and consisted of wires attached to the front door

and several office doors inside the building, together with six to seven infrared motion detectors aimed at certain areas, or "zones," within the building. The motion detectors monitored the ambient heat of the area at which they were directed, so that if a person entered the monitor's "field" the monitor would register the person's body heat as a change in the field which would cause an alarm signal to trigger.

Thus, in the high school's case, after the system had been "armed," *i.e.*, set, if a protected door was opened or someone entered a protected area, the system would immediately send a signal through the telephone lines to Sonitrol's main office. The signal would register on a computer screen being overseen by a Sonitrol employee. The employee was then to take appropriate action.

The record reveals that on the morning of September 11, 1990, the two juveniles broke through windows and entered offices of the building which were *not* equipped with Sonitrol's monitoring devices. Starting at 4:03 a.m., however, Sonitrol's computer screen began receiving alarm signals from the building's monitors. Although she observed these signals, Sonitrol's employee Kimberly Barkley did not notify the police department and was unable to reach anyone from the school. Barkley merely continued to observe the signals.

At approximately 5:40 a.m., Barkley finally reached the school's head night custodian. Barkley stated that she was shutting off the system because it was malfunctioning. Ultimately, the fire was discovered by a police officer only by chance. The board duly filed a claim for the damage done to the building with its insurer, Nationwide.

On October 22, 1990, Nationwide filed a complaint in the Cuyahoga County Court of Common Pleas against Sonitrol and the two juveniles and their families, seeking damages for the amount it had paid to the board pursuant to the insurance policy.[2] This case was designated No. CV–199184.

Nationwide alleged that the insurance policy's subrogation clause entitled it to pursue an action against Sonitrol, and that Sonitrol's actions when it received the alarm signal on September 16, 1990 not only were negligent, but constituted a breach of the agreement it had with the board. The complaint was later amended to include language indicating that Sonitrol's negligence was in wanton disregard of a "contractual and a legal duty." Nationwide attached to its complaint a copy of the board's insurance policy. Included in the policy was the following clause:

---

2. Nationwide's claims against the juveniles and their families were later settled and dismissed and are not a part of these appeals.

"CLAIMS AGAINST OTHERS

"1. **Subrogation.** If we pay for a loss, we may require the insured to assign to us the right of recovery against others. We will not pay for a loss if the insured impairs this right to recover. *The insured's right to recover from others may be waived in writing before a loss occurs.*" (Emphasis added.)

Sonitrol answered the complaint by denying the pertinent allegations and setting up several affirmative defenses. Following some discovery,[3] Sonitrol filed a motion for summary judgment. Therein, Sonitrol argued that it was entitled to judgment on Nationwide's claims as a matter of law because the claims were based upon "*non-existent* derivative rights." (Emphasis added.) Sonitrol drew the trial court's attention to paragraph 16 of its contract with the board, which stated that the board waived its right of recovery against Sonitrol for *any loss covered by insurance.*

Furthermore, Sonitrol attached to its motion the deposition testimony of Kenneth Masti, the Sonitrol employee who acted as customer representative to the board and had sold the security system to it. Masti stated the following: (1) the board had bought a *burglary* and vandalism detection system which protected only *certain* areas; (2) a detection system specifically for fires was not discussed, but he made it clear that it was a separate system which Sonitrol could provide if one was requested; (3) the system's infrared sensors were "strictly for burglary" protection; and (4) the board wanted the "most economical" burglary protection Sonitrol could provide.

Nationwide filed a brief in opposition to Sonitrol's motion, arguing that the contract's paragraph 16 did not entitle Sonitrol to summary judgment for three reasons: (1) it either was not a waiver of subrogation or was ambiguous because it did not state that in clear terms; (2) it precluded a waiver of subrogation in this case based upon the words "to the extent permitted by any policy" because Nationwide's insurance policies did not permit waiver of subrogation; and (3) it did not apply since Sonitrol's actions were so "egregious." Nationwide filed numerous exhibits in support of its brief in opposition to Sonitrol's motion for summary judgment, including deposition transcripts, affidavits and several "statements."

Sonitrol filed a brief in reply, attaching thereto a copy of the board's insurance policy with Nationwide,[4] together with a copy of a letter indicating that the board had notified Sonitrol to be cautious in reporting to the police what actually could be a "false alarm."

---

3. Several depositions of persons involved in the case were taken by the parties and later filed in the trial court.

4. The record reveals that the copy which Nationwide had attached to the complaint was an incorrect version of the policy actually issued to the board.

On September 13, 1991, while Sonitrol's motion was pending, the board filed its own complaint in the Cuyahoga County Court of Common Pleas, seeking damages in the amount of $322,000 for the costs due to the fire which had not been covered by the insurance policy with Nationwide.[5] The board asserted the same two causes of action against Sonitrol as Nationwide had asserted, *viz.*, negligence and breach of contract. This case was designated No. CV–218128.

On November 6, 1991, the trial court granted Sonitrol's motion for summary judgment against Nationwide in case No. CV–199184. On November 14, 1991, Sonitrol filed its answer in case No. CV–218128.

On January 24, 1992, Sonitrol filed a motion for partial summary judgment in case No. CV–218128. Sonitrol asserted that since paragraph 14(c) of its contract with the board limited the board's recovery for noncovered losses, it was entitled to summary judgment on the issue of damages.

On February 27, 1992, the board filed a brief in opposition to Sonitrol's motion, arguing that the limitation of damages clause contained in the contract should be declared unenforceable based upon this court's decision in *State Auto. Ins. Co. v. Sonitrol of Cleveland, Inc.* (Dec. 3, 1987), Cuyahoga App. No. 54186, unreported, 1987 WL 25749.

On March 3, 1992, Sonitrol filed a motion to consolidate case Nos. CV–199184 and CV–218128. The trial court granted the motion on June 3, 1992.

On August 27, 1992, after each of the parties in case No. CV–218128 had filed another brief in support of their position, the trial court granted Sonitrol's motion for partial summary judgment on the issue of damages.

Thereafter, on October 26, 1993, Sonitrol filed a motion for summary judgment with respect to the issue of liability. Sonitrol argued that the evidence proved neither that it was negligent nor that it had breached its contract with the board; thus, it was entitled to judgment as a matter of law. Sonitrol attached to its motion the following: (1) the affidavit of Kenneth Masti, (2) the deposition testimony of one of the juveniles, and (3) the (second) deposition testimony of Kenneth Masti.

On December 13, 1993, the board filed a brief in opposition, arguing that the evidence submitted to the trial court clearly demonstrated both Sonitrol's negligence and its breach of the contract's requirement to notify the police department upon receipt of a burglary signal.

On February 9, 1994, Sonitrol filed a supplementary brief in support of its motion. Therein, Sonitrol relied on the deposition testimony of Kimberly Barkley

---

5. The board also stated claims against the two juveniles and their families which were later settled and dismissed and are not a part of these appeals.

and one of her supervisors to argue that its actions upon receipt of the signal from the high school building were reasonable and were not in contravention of the contract's terms.

On February 11, 1994, the trial court granted Sonitrol's motion for summary judgment. Following the resolution of all the outstanding claims in the consolidated cases, Nationwide and the Board filed timely notices of appeal in this court.

This court also has consolidated case Nos. CV–199184 (designated App. No. 68583) and CV–218128 (designated App. No. 68584) for briefing, hearing and disposition. In their single appellate brief, Nationwide and the board present five assignments of error for this court's review. The first follows:

"I. The trial court erred in granting summary judgment for Sonitrol because the alleged 'waiver of subrogation' clause is ineffective to waive the North Olmsted School's and Nationwide's subrogation rights.

In this assignment of error, Nationwide argues that the trial court should have held paragraph 16 of the board's agreement with Sonitrol, the waiver of subrogation clause, unenforceable since (1) Sonitrol did not attempt to "explain" it; (2) its customer, the board, didn't "understand" it; (3) it was "hidden"; and (4) the board was not "allowed" to negotiate concerning the clause. This court cannot agree with Nationwide's argument.

The Ohio Supreme Court recently reviewed a contract containing a subrogation clause and explained such clauses as follows:

"In Ohio, there are three distinct kinds of subrogation: legal, statutory, and conventional. *Legal subrogation arises by operation of law and applies when one person is subrogated to certain rights of another so that the person is substituted in the place of the other and succeeds to the rights of the other person. State v. Jones* (1980), 61 Ohio St.2d 99, 100–101, 15 O.O.3d 132, 133, 399 N.E.2d 1215, 1216–1217. Statutory subrogation is a right that exists only against a wrongdoer. *Conventional subrogation is premised on the contractual obligations of the parties,* either express or implied. The *focus* of conventional subrogation *is the agreement of the parties. Id.* at 101, 15 O.O.3d at 133, 399 N.E.2d at 1217." (Emphasis added.) *Blue Cross & Blue Shield Mut. of Ohio v. Hrenko* (1995), 72 Ohio St.3d 120, 122, 647 N.E.2d 1358, 1359.

With regard to legal subrogation, the Supreme Court has previously held that parties to a contract may modify, extinguish or even completely destroy the right. See, *e.g., Bogan v. Progressive Ins. Co.* (1988), 36 Ohio St.3d 22, 521 N.E.2d 447. Moreover, contractual subrogation clauses are controlled by contract principles, including those of interpretation of language. *Blue Cross & Blue Shield Mut. of Ohio v. Hrenko, supra.* It is axiomatic that an insurer-subrogee cannot succeed to or acquire any right or remedy not possessed by its insured-

subrogor. *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 537 N.E.2d 624, paragraph one of the syllabus.

██ In this case, Nationwide attempted to put itself in the board's place in order to pursue an action against Sonitrol. However, the board signed a contract with Sonitrol which contained several clauses alerting the board to the following factors: (1) Sonitrol's services were offered with only a limited warranty; (2) Sonitrol's services could be interrupted by causes beyond the parties' control; (3) the board was purchasing only one of the protective services available; (4) Sonitrol was not an insurer; and (5) Sonitrol recommended that the board purchase insurance to cover any losses which might occur for any reason.

The fact that the board did purchase an insurance policy demonstrates that it was aware of these clauses. Furthermore, it demonstrates that the board comprehended the contract's language and understood the contract's terms. Thus, Nationwide's argument that the clause waiving subrogation was "ambiguous" and "hidden" seems disingenuous.

Indeed, since the board was purchasing insurance with Nationwide, it would have no reason to object to this clause, which merely restated the matters to which it had been already alerted and indicated that insurance would cover any losses.

"Other jurisdictions construing similar contract provisions have upheld contract provisions where the parties agreed to waive claims of personal liability in the event of a loss or peril, with the understanding that the loss would be covered by insurance." *Len Immke Buick v. Architectural Alliance* (1992), 81 Ohio App.3d 459, 464, 611 N.E.2d 399, 402.

Under the circumstances of this case, the waiver of subrogation clause was both clear and reasonable. *Id.* Since Nationwide stood in the board's place and the board had waived its right of recovery against Sonitrol, the trial court did not err in granting Sonitrol's motion for summary judgment against Nationwide. *Am. States Ins. Co. v. Honeywell, Inc.* (Mar. 1, 1990), Cuyahoga App. No. 56552, unreported, 1990 WL 19319.

Accordingly, the first assignment of error is overruled.

Assignments of Error II, III and V are interrelated; thus, they are addressed together as follows:

"II. The trial court erred in granting summary judgment because genuine issues of material fact exist regarding whether Sonitrol acted wilfully and wantonly and thus voided the application of the alleged 'waiver of subrogation' clause.

"III. The trial court erred in granting summary judgment for Sonitrol because genuine issues of material fact exist as to whether Sonitrol committed the tort of willful and wanton misconduct.

"V. The trial court erred by granting Sonitrol's motion for summary judgment of October 26, 1993 against both appellants where genuine issues of material fact exist relating in part to: (1) the actions of Sonitrol's employees; (2) the nature of Sonitrol's security system at the North Olmsted High School; and (3) the operation of that system on September 16, 1990."

 Nationwide and the board argue that even if the waiver of subrogation clause is contractually valid, it cannot be enforced in a case where a party to a contract "wilfully and wantonly" failed to carry out its contractual duties. Nationwide and the board contend that issues of fact remain concerning whether Sonitrol's actions in this case were negligent and in breach of its contract with the board. A review of the record, however, does not support these arguments.

The contract clearly stated that the security system was designed to detect only burglaries; fire detection systems were completely different. It also clearly stated that Sonitrol's employees would use their judgment in interpreting the signals received when the system was triggered. Moreover, it stated that the employees' actions would be reasonable based upon their judgment.

The evidence that the juveniles who entered the building did *not* activate the system was undisputed. The juveniles neither opened the protected doors nor entered the protected "zones" of the building. Thus, the system was not triggered by a burglary.

Nationwide and the board rely heavily on the fact that Barkley's computer screen showed numerous "BURG" signals after 4:03 a.m., but that she took little action in regard to the signals. The evidence before the trial court, however, proved that the *very number and sequence* of these signals indicated to the employee only a *malfunction*. The signals indicated neither a burglary (which was accurate because it was not occurring as far as the *system* was concerned), nor a fire because the system was not designed to detect fires.

Clearly, the juveniles did not set off the burglary signal, since they disturbed nothing that would trigger it. From the testimony of Sonitrol's employees, it is equally clear that the heat from the fire also did not trigger the alarm; rather it *affected* it by *destroying* it. Thus, Barkley *correctly* concluded from the signals she was receiving that the system was malfunctioning. The evidence before the trial court therefore proved only that Barkley's actions in the face of this eventuality were both reasonable and in accordance with the specific terms of the contract.

■ Civ.R. 56(C) makes summary judgment proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 24 O.O.3d 1, 433 N.E.2d 615. A motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095.

"Although the distinction between tort liability and contract liability has apparently been eroded away by our sister states, a review of the case law of the state of Ohio indicates that a party to contract can only be liable in tort, in relation to the contract, where some positive duty imposed by law has been breached by the alleged negligent conduct of one of the parties to the contract.

" 'It has long been the general rule and so recognized in this state, that, when the only relation between the parties is contractual, the liability of one to the other, in an action of tort, must arise out of some positive duty which the law imposes because of the relationship, or because of the negligent manner in which some act which the contract provides for is done; and the mere omission to perform a contract obligation is never a tort unless the omission is also the omission to perform a legal duty. * * *' *Bowman v. Goldsmith Bros. Co.* (App.1952), 63 Ohio Law Abs. 428 at 431 [109 N.E.2d 556, 557].

" * * * [W]illful or wanton misconduct on the part of a party to a contract can [also] result in the imposition of tort liability. Cf. *Royal Indemn. Co. v. Baker Protective Services, Inc.* (1986), 33 Ohio App.3d 184 [515 N.E.2d 5]; *Hine v. Dayton Speedway Corp.* (1969), 20 Ohio App.2d 185 [49 O.O.2d 249, 252 N.E.2d 648]; Prosser and Keeton, Law of Torts (5 Ed.1984), 655–669, Section 92." *Am. States Ins. Co. v. Honeywell, Inc., supra.*

In this case, Nationwide and the board proved neither that Sonitrol's actions were in breach of the contract nor that Sonitrol's actions were in any way "willful or wanton" so as to either create tort liability or void the waiver of subrogation clause. Therefore, the trial court did not err in granting Sonitrol's motions for summary judgment. *Id.*

Accordingly, Assignments of Error II, III and V are also overruled.

The final assignment of error states:

"IV. The trial court erred in granting summary judgment for Sonitrol because the limitation of damages clause is unconscionable and, therefore, unenforceable."

The board argues that because the over $3,000,000 in damages it sustained in the fire was so disproportionate to the cap Sonitrol agreed to pay, the limitation of damages clause of the agreement must be declared an unenforceable penalty.

The board relies on *Samson Sales, Inc. v. Honeywell, Inc.* (1984), 12 Ohio St.3d 27, 12 OBR 23, 465 N.E.2d 392, in support of its argument.

In *Samson*, the Supreme Court set forth the following as the factors to be considered in determining the validity of limitation of liability clauses:

"[C]lauses in contracts providing for reasonable liquidated damages are recognized in Ohio as valid and enforceable. *Lange v. Werk* (1853), 2 Ohio St. 519; *Jones v. Stevens* (1925), 112 Ohio St. 43 [146 N.E. 894]; 30 Ohio Jurisprudence 3d (1981) 136–137, Section 128. However, reasonable compensation for actual damages is the legitimate objective of such liquidated damage provisions and where the amount specified is manifestly inequitable and unrealistic, courts will ordinarily regard it as a penalty. * * *

"Whether a particular sum specified in a contract is intended as a penalty or as liquidated damages *depends upon the operative facts and circumstances surrounding each particular case*, but time has apparently had no undermining influence upon *the guiding principles* initially set forth in *Jones v. Stevens, supra*, where the court held at paragraph two of the syllabus:

" 'Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, *the amount so fixed should be treated as liquidated damages* and not as a penalty, *if the damages would be (1) uncertain as to amount and difficulty of proof*, and if (2) *the contract as a whole is not* so manifestly unconscionable, *unreasonable*, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was *the intention of the parties that damages in the amount stated should follow the breach thereof.'* " (Emphasis added.) *Samson*, 12 Ohio St.3d at 28–29, 12 OBR at 24–25 465 N.E.2d at 393–394.

 Thus, a liquidated damages clause is enforceable if, in consideration of the facts surrounding the contract, its objective is the reasonable compensation of actual damages flowing from the breach of the contract. *Cad Cam, Inc. v. Underwood* (1987), 36 Ohio App.3d 90, 521 N.E.2d 498; *Williams v. Mark IV Apts.* (Sept. 22, 1994), Cuyahoga App. No. 65915, unreported, 1994 WL 521136.

 In this case, Sonitrol and the board entered into an agreement for *burglary* protection for a few offices and corridors of a high school building. The amount of money or the actual items which could be taken by a thief would be difficult to ascertain. See, *e.g., id.* Furthermore, in contrast to the store sought to be protected in *Samson*, the likelihood that there were extremely *valuable* items in these areas was not great. Cf. *Nationwide Mut. Fire Ins. Co. v. T & J Transp. & Warehouse* (Jan. 25, 1991), Lucas App. No. L–90–097, 1991 WL 7274;

*Zurich–American Ins. Co. v. Citadel Alarm, Inc.* (May 6, 1986), Cuyahoga App. No. 50499, unreported, 1986 WL 5291.

From reading the agreement in this case, it is also clear that the parties did not contemplate the possibility of *fire* damage to the premises. See, *e.g., Nationwide Mut. Fire Ins. Co. v. T & J Transp. & Warehouse, supra.* Thus, it would be manifestly unfair at this juncture to declare the limitation of damages clause unenforceable since it would not be in accordance with the "true intention of the parties." *Samson Sales, Inc. v. Honeywell, Inc., supra,* 12 Ohio St.3d at 27, 12 OBR at 23, 465 N.E.2d at 392.

A review of the facts and circumstances of this case leads to the conclusion that the trial court correctly determined that the limitation of damages clause was reasonable and enforceable. Therefore, Sonitrol's motion for partial summary judgment was properly granted.

Accordingly, Assignment of Error IV is also overruled.

The judgment of the trial court is affirmed in its entirety.

*Judgment affirmed.*

KARPINSKI and MCMONAGLE, JJ., concur.