**W.D.I.A. CORPORATION d/b/a National Credit Information Network and NCI, Plaintiff,**

v.

**McGRAW–HILL, INC. and Jeffrey Rothfeder, Defendants.**

No. C–1–93–448.

United States District Court, S.D. Ohio, Western Division.

Dec. 18, 1998.

John Geoffrey Cobey, Michael Harvey Siegler, Cincinnati, OH, Eric H. Kearney, Denise C. Lee, Cohen Todd Kite & Stanford, Cincinnati, OH, for plaintiff.

Richard Michael Goehler, Frost & Jacobs—1, Cincinnati, OH, Floyd Abrams, Anne B Carroll, Cahill Gordon & Reindel, New York City, for McGraw–Hill Inc., Jeffrey Rothfeder, defendants.

### *ORDER*

HERMAN J. WEBER, District Judge.

This is an action in breach of contract and fraud brought by plaintiff W.D.I.A. Corporation d/b/a National Credit Information Network and NCI (W.D.I.A.) against defendants McGraw–Hill, Inc. (McGraw–Hill) and Jeffrey Rothfeder (Rothfeder). The plaintiff alleges that the defendants engaged in fraud to induce plaintiff to enter into a contract, then willfully and wantonly breached the contract in conscious disregard of plaintiff's rights, resulting in damage to plaintiff.

On or about April 1, 1989, Rothfeder presented to his Editors the idea for an article for *Business Week* Magazine. The article, entitled "Is Nothing Private?" (the "article"), was published in the September 4, 1989 *Business Week.*

With the prior approval of his supervisors at McGraw–Hill and McGraw–Hill attorneys,

Rothfeder executed a test of the system used by the credit reporting industry to comply with the federal Fair Credit Reporting Act (FCRA). The test, as devised by Rothfeder and approved by McGraw–Hill, called for Rothfeder to lie deliberately to consumer reporting agencies in order to induce the agencies to grant McGraw–Hill access to sensitive confidential information protected by federal law. The article reported that Rothfeder told at least one fib and successfully acquired consumer credit information on individuals, including then-Vice President Dan Quayle, from an on-line information reseller. The reseller was not identified in the article.

W.D.I.A. claims Rothfeder, acting with McGraw–Hill's authorization and on behalf of McGraw–Hill, deliberately, willfully and wantonly lied to W.D.I.A. when he *inter alia* stated that McGraw–Hill had a permissible purpose under the FCRA for obtaining credit reports and when he agreed McGraw–Hill would obtain credit reports only for permissible purposes as defined under the FCRA. The FCRA permits the acquisition of credit information only for permissible purposes as defined in the FCRA and makes it a criminal offense for any person to acquire such information under false pretenses.

Based on the promises of Rothfeder and McGraw–Hill and after processing the McGraw–Hill application through its procedures as required under the FCRA, conducting an on-site visit to McGraw–Hill offices, considering Rothfeder's oral and written representations, and making sure that Rothfeder understood FCRA requirements, W.D.I.A. agreed to release credit information to McGraw–Hill.

After McGraw–Hill's successful execution of the Rothfeder test, the Federal Trade Commission ("FTC") launched an investigation of W.D.I.A. procedures. The McGraw–Hill test also became the focus of Congressional Hearings on the effectiveness of the FCRA before the United States House of Representatives Subcommittee on Consumer Affairs.

Plaintiff alleges that defendants' actions damaged plaintiff by *inter alia* making it necessary for plaintiff to expend monies for damage control efforts aimed at the credit bureaus from whom plaintiff purchases credit information and to expend monies addressing FTC and congressional concerns. W.D.I.A. seeks compensatory damages in excess of $75,000 and $45 million in punitive damages.

McGraw–Hill and Rothfeder answer W.D.I.A.'s claims arguing that the claims are barred by the First Amendment's prohibition of actions for reputational injury flowing from the publication of truthful information about matters of public concern; this Court lacks subject matter jurisdiction because the amount of damages required to confer subject matter jurisdiction on this Court was not in controversy at the commencement of this action; in the absence of a clearly articulated legislative intention, state law will not be read so as to raise a significant constitutional question; W.D.I.A. cannot prove any cognizable damage was caused by the conduct alleged; W.D.I.A. did not justifiably rely on the claimed misrepresentations; the contract terms with respect to FCRA compliance were not material to the agreement embodied in the W.D.I.A. form contract or to the parties' transaction; W.D.I.A. waived performance of these contract terms and is estopped from enforcing them; and, in any event, its remedies under the contract are limited to the terms of the contract's indemnification clause. Defendants further assert that W.D.I.A. cannot demonstrate by the required standard of clear and convincing evidence that defendants acted with the state of mind necessary to undergird a claim for punitive damages.

## *JURISDICTION*

The first issue the Court must determine is whether it has subject matter jurisdiction. The plaintiff, W.D.I.A., is an Ohio corporation located in Cincinnati, Ohio. The defendant, Jeffrey Rothfeder, is a citizen of New Jersey. The defendant, McGraw–Hill, Inc., is a corporation incorporated in New York where it maintains its office.

The defendants object to the subject matter jurisdiction of this Court solely on the basis that the claim of the plaintiff does not meet the amount-in-controversy requirement of 28 U.S.C. § 1332(a). The defendants con-

cede this Court has personal jurisdiction of the parties, venue is proper in this Court and the citizenship of the parties is diverse.

In *Jones v. Knox Exploration Corp.*, 2 F.3d 181 (6th Cir.1993), we are instructed that a federal court's jurisdiction ordinarily depends "on the facts as they exist when the complaint is filed." *Id.* at 182. If a good faith claim of sufficient amount is made in the complaint, subsequent events that reduce the amount below the statutory requirement do not require dismissal. *Id.* at 182–183. Where an action contains two claims, which together satisfied the jurisdictional amount requirement and one claim is eliminated following discovery, the fact that the only remaining claim is for less than the jurisdictional amount does not require dismissal. *Id.* at 182. Where three claims for damages in the complaint satisfy the jurisdictional amount requirement in the aggregate, dismissal of two of the claims does not deprive the district court of jurisdiction. *Id.* at 182.

W.D.I.A.'s third claim in its complaint and amended complaint seeks relief for violations of Ohio Rev.Code Section 2923.34, known as the Ohio Corrupt Practice Act. Under the Act, W.D.I.A. demands, in addition to compensatory damages of $489,241.00 and punitive damages of no less than $45,000,000, that this Court order divestiture of *Business Week* from McGraw–Hill and revoke McGraw–Hill's license to operate in Ohio.

In their answer, the defendants admit that plaintiff purports to claim damages in excess of $50,000. The defendants make no allegations in their answer that the relief and amounts claimed by W.D.I.A. are made in bad faith.

Subsequent to the initial pleadings, this Court dismissed W.D.I.A.'s third claim. Had the plaintiff prevailed on its claim, the monetary loss to McGraw–Hill caused by the divestiture of *Business Week* and the loss of the revenues generated by Business Week to McGraw–Hill would far exceed $75,000, the presently required jurisdictional amount. The monetary claims of W.D.I.A. which remain exceed $75,000.

This Court therefore concludes that the amount-in-controversy requirement of 28 U.S.C. § 1332(a) has been met and it has subject matter jurisdiction of this controversy.

## FINDINGS OF FACT

1. In the Spring of 1989, the McGraw–Hill Companies, Inc., formerly known as McGraw–Hill, Inc. (McGraw–Hill) and Jeffrey Rothfeder, the defendants, intentionally decided to investigate W.D.I.A. At all times pertinent, Jeffrey Rothfeder was an employee of McGraw–Hill acting within the scope of his employment. The decision to proceed with the plan to investigate W.D.I.A. was made by senior management of McGraw–Hill doing business as *Business Week*.

2. W.D.I.A. was at the time one of approximately 25 on-line superbureaus in the credit reporting business. Superbureaus provide a service to their clients which allows clients direct instant access through computer linkages to the credit report files of individuals maintained by the big three credit reporting agencies—TRW, Equifax and TransUnion Corporation. These files contain much private information about most of us. W.D.I.A. is regulated by the Federal Trade Commission and is subject to the Fair Credit Reporting Act (FCRA). 15 U.S.C. §§ 1681 to 1681t.

3. Defendants learned of W.D.I.A.'s services through a W.D.I.A. advertisement. Defendants contacted Marty Dunham, a marketing representative of W.D.I.A. Defendants expressed interest in obtaining W.D.I.A.'s services to Dunham. Defendants told Dunham that defendants sought consumer credit reports for use in background checks on potential employees. Defendants at no time intended to use the credit reports for this stated purpose. Defendants, who were very familiar with the Fair Credit Reporting Act, learned from Dunham that which they already knew, which is that by misrepresenting the purpose for which a credit report was sought, defendants could prevent the sending of the notification letter required by law to the subject of a requested credit report. Defendants did not engage in this tactic and, in fact, contacted all persons who were the sub-

ject of their requests for credit information, informing them that defendants had obtained their credit reports.

4. Defendants purchased an access package including a subscriber application for W.D.I.A.'s services from Dunham for $495.00.

5. Defendants completed and submitted the application for W.D.I.A.'s services to W.D.I.A. Defendants intentionally put inconsistent and false information in their application. When contacted personally during the application screening process by an investigator for W.D.I.A. at defendants' place of business, defendants intentionally misled the investigator by half-truths and silence. Defendants stated to the investigator that their purpose for obtaining credit reports was pre-employment screening. Defendants knew this representation was false at the time it was made. Defendants had the specific intent to use the credit reports for their investigation of W.D.I.A. and the credit reporting industry and for no other purpose. W.D.I.A. rightfully relied on the representations made to the investigator. These representations were false.

6. Defendants' application for services was accepted by W.D.I.A.

7. W.D.I.A. became aware during its review of the application of (a) the discrepancies and gaps in the application; (b) the inconsistency between the employment purpose Rothfeder reported to Dunham and the on-site investigator and the purposes he had listed in the application; (c) the divergence between the purposes enumerated by Rothfeder in his application and the nature of McGraw–Hill's business; (d) the fact that Rothfeder was an editor at *Business Week* magazine; and (e) the assertion on the application that Rothfeder would be the only person accessing credit reports.

8. Although W.D.I.A. noted all of these discrepancies, incongruities and omissions in the information provided by Rothfeder, it did not consider them important.

9. W.D.I.A. recognized the flaws in the application but ignored them, rightfully concluding the flaws were not important because of the good reputation for truth and veracity

the defendants enjoyed worldwide. Defendants repeatedly represented that their requests for credit information were for the permissible purpose under the FCRA of pre-employment screening knowing the representations were false at the time they were made by the defendants.

10. In July, 1989, defendants intentionally obtained credit reports to further their investigation of the credit reporting industry. Defendants obtained these reports by intentionally stating a falsehood, i.e., that they were obtaining the reports for pre-employment purposes.

11. On July 19, 1989, the defendants obtained then–Vice–President Dan Quayle's credit report. From the date the Vice–President's credit report was obtained until the publication of the article in late August 1989, neither W.D.I.A. nor anyone else other than individuals at *Business Week* knew that Mr. Quayle's credit report had been obtained. No damage was sustained by W.D.I.A. during this period.

12. W.D.I.A. itself obtained the credit report of Vice–President Quayle, though it never received permission to do so and had no other permissible purpose under the FCRA. In addition, W.D.I.A. was required by the FCRA to send letters to the subjects whose reports were obtained, notifying them that their credit reports had been obtained for employment purposes, but W.D.I.A. failed to do so. Through its agent Dunham, W.D.I.A. gave Rothfeder advice on how to avoid the requirements of federal law in obtaining credit reports. All of these were violations of the FCRA by W.D.I.A. which constituted breaches by W.D.I.A. of the term of its form agreement with defendants in which W.D.I.A. promised to obey the FCRA. No damage was caused to defendants by these breaches by W.D.I.A. These breaches were not substantial.

13. The defendants received permission to use the credit reports from all of the subjects of the credit reports either before or after the reports were obtained. The subjects of the credit reports have made no claim for damages against W.D.I.A. for the use of their credit reports by defendants.

W.D.I.A. has experienced no damage claims from any consumer as a result of defendants' activities.

14. By making a trip to Chicago to meet with TransUnion, W.D.I.A. was able to avert being cut off from access to credit information by T.R.W., Equifax and TransUnion Corporation, which would have damaged W.D.I.A. Other than the cost of the trip to Chicago, W.D.I.A. suffered no damage as a result of defendants' activities prior to publication of the article.

15. During the course of his research for the article, Rothfeder interviewed Jean Noonan, Esq., then Associate Director for Credit Practices of the Federal Trade Commission in charge of enforcing the FCRA. Rothfeder never revealed to Noonan—or to anyone else besides his supervisor—either before or after the publication of the article that WDIA was a subject of *Business Week*'s test of the credit reporting system. Rothfeder did not reveal to Noonan or to anyone else at the FTC prior to the publication of the article that he was doing a test of the credit reporting system.

16. The article did not identify W.D.I.A. in any way, not even by the part of the country in which it is located. The decision to refrain from doing so was made by McGraw–Hill and Rothfeder because they did not think that W.D.I.A.'s conduct was at all unique in the credit reporting industry, particularly among superbureaus, and thus did not want to expose W.D.I.A. individually to public criticism for conduct defendants considered commonplace in the industry.

17. Six months before the events at issue in this case, Barry Connelly and Associated Credit Bureaus ("ACB"), the credit bureau trade association he now heads, determined to do a secret test, which he characterized as a "compliance audit" of W.D.I.A.—even though W.D.I.A. was not an ACB member. The decision was made in response to an ACB member agency's complaint about a W.D.I.A. advertisement which indicated that W.D.I.A. was engaged in practices which threatened the security of consumer credit information and violated the FCRA.

18. Connelly reported W.D.I.A. to Noonan and her enforcement staff at the Federal Trade Commission (FTC) in December 1988, enclosing the advertisement and suggesting that the FTC investigate W.D.I.A.

19. Connelly arranged for an ACB staff member, Jay Maddox, to fabricate a business, purchase business cards with the false business name printed on them, obtain a federal employer identification number for that nonexistent enterprise, and make up false permissible purposes to obtain FCRA-protected credit reports. Maddox obtained a W.D.I.A. application and completed it using this false information. Maddox signed a form contract in the application identical to the form contract Rothfeder would later sign. He was approved as a W.D.I.A. subscriber and accessed credit reports through its system. ACB regarded its test as successful because W.D.I.A. failed to prevent a dubious user, Maddox, from obtaining confidential consumer credit information based on false credentials and manufactured permissible purposes.

20. Such compliance audits (also known by the term mystery shopping) are common in the credit reporting industry, which welcomes them and regards them as very helpful. The ACB conducts such tests two to three times a year. TransUnion conducts them as well.

21. During a meeting with the FTC in April 1989, Connelly reported to Noonan the fact that W.D.I.A. had been subjected to, and had failed, ACB's test. Connelly's complaint letter was the catalyst for the FTC's later investigation of and charges against W.D.I.A.

22. Connelly also reported the result of the compliance audit to W.D.I.A.'s information suppliers, including TransUnion. TransUnion cut off W.D.I.A. for eight weeks from all information without prior notice, preventing W.D.I.A. from providing its subscribers with access to TransUnion credit reports. W.D.I.A. first learned about the ACB compliance audit when TransUnion cut off its information service. Connelly believed that he had no obligation, even after the completion of the test, to let W.D.I.A. know what ACB had done.

23. Connelly believed ACB had an obligation to its members (of which W.D.I.A. was not and is not one) to do the compliance audit of W.D.I.A., to find out "where the loose screw was" in the system because the credit reporting industry was undergoing government scrutiny and feared that negative publicity about abuses by the superbureaus would result in Congressional reform initiatives directed at the entire industry. It was therefore "very important," he said, for industry leaders to be aware of abuses in the system.

24. ACB's test of W.D.I.A. was, in Connelly's words, "a clean, honest approach to trying to find out [about W.D.I.A.'s failure to comply with federal laws] and keep it within the family, keep it within the context of the association and its members and go back to them and say now here, this is what we did."

25. W.D.I.A. does not believe that ACB committed any wrong against it through its secret compliance audit. At the time it discovered what ACB had done, W.D.I.A. "commend[ed]" ACB for its actions, encouraged ACB to undertake more such investigations, and expressed satisfaction that it was ACB rather than the regulators at the FTC who had conducted the audit.

26. On September 1, 1989 the FTC notified W.D.I.A. by letter that it had undertaken an investigation of W.D.I.A.'s practices in the sale of credit reports. This investigation was not caused by any act of either defendant nor by the publication of the article, but was triggered by the complaint lodged against W.D.I.A. by Connelly and ACB.

27. The query to W.D.I.A. in the September 1, 1989 letter concerning events recounted in the *Business Week* article was not the result of anything said to Noonan by Rothfeder.

28. The FTC conducted a two-and-a-half year investigation of W.D.I.A. that resulted in the conclusion by the FTC in May 1992 that W.D.I.A. was violating FCRA by, *inter alia,* "failing to maintain reasonable procedures to limit the furnishing of consumer reports to the purposes set forth in [the statute]."

29. In December 1994, W.D.I.A., Hanna and Campanello voluntarily agreed to a settlement with the FTC and entered a "Consent Order to Cease and Desist."

30. Under the terms of the Consent Order, W.D.I.A. and its officers individually agreed (a) to refrain from further violations of the FCRA; (b) to submit to FTC monitoring for five years; and (c) to "do or continu[e] to do" a broad range of actions to ensure their continuing compliance with the law. Among the specific actions which W.D.I.A. and its officers agreed to take pursuant to the Consent Order was a program of recertifying W.D.I.A.'s subscribers.

31. The issue of *Business Week* containing the article became available on or about August 29, 1989.

32. The Federal Trade Commission's investigation was launched on September 1, 1989 because of the concerns brought to the attention of the Commission by Barry Connelly and W.D.I.A. itself.

33. After the publication of the article, W.D.I.A. itself, through Mark Hanna, informed TransUnion and its other information suppliers that it was the superbureau that had permitted access to the Vice-President's credit report by *Business Week.* Oscar Marquis, the general counsel of TransUnion, testified that neither he nor anyone else in his company knew that W.D.I.A. had allowed access to the Vice-President's credit report in the six-week period after the report was obtained; he did not know it after reading the *Business Week* article; and his knowledge that W.D.I.A. was the company involved came solely from Hanna. Connelly, too, testified that Hanna was the person he had heard from regarding W.D.I.A.'s connection to the events described in the *Business Week* article. W.D.I.A.'s actions in notifying TransUnion and Connelly and the W.D.I.A. trip to Chicago were reasonable and necessary because of W.D.I.A.'s previous experience after the ACB test and TransUnion's reactions to the ACB test.

34. For the first time in its illustrious history, McGraw–Hill deliberately and intentionally made misrepresentations and promises to an entity in writing which it had no

intention of keeping at the very time the written promises were made. For the first time in his career as a journalist, Jeffrey Rothfeder made misrepresentations and promises to an entity in writing which he had no intention of keeping at the very time the written promises were made. In this case, the entity they happened to choose was W.D.I.A.

35. The false promises made by the defendants on June 19, 1989 in the Agreement pertinent to the decision of the Court are:

The CLIENT agrees:

1. To conform to all provisions of Public Law 91–508 (Fair Credit Reporting Act), a copy of which is attached hereto and made a part hereof, and all regulations of the VENDOR now effective or as subsequently amended or adopted.

2. To hold in strict confidence all information received from the VENDOR, whether written or verbal, and not to communicate such confidential information to any other person or party who does not specifically have a legitimate right to review such information, as set forth in the above Public Law 91–508 and to be responsible for any liability or damages arising from a violation of this provision.

3. That all inquiries will be made solely for a permissible purpose as defined in Public Law 91–508 section 604, and that all inquiries for employment purposes only be obtained through the employment purpose section of the NCI Network.

5. Payment of bills rendered shall be made in accordance with the accounts receivables policy, a copy of which is attached hereto and made a part herein.

7. To furnish to the VENDOR credit information on any consumer when requested. . . .

The VENDOR agrees:

1. To maintain credit reporting files, recording information furnished by its clients and obtained from all available sources within the scope and in accordance with the provisions of Public Law 91–508 presently effective or as amended. . . .

Mutual Indemnification: The VENDOR shall indemnify, defend and hold the CLIENT harmless for and against any and all costs and liabilities which may be asserted against the CLIENT based upon the improper use by the VENDOR of credit information furnished to the VENDOR by the CLIENT. The CLIENT shall indemnify, defend and hold the VENDOR harmless from and against any and all costs and liabilities which may be asserted against the VENDOR based upon the improper use by the CLIENT of credit information furnished to the CLIENT by the VENDOR.

36. The defendants did not intend to keep their promise at the very time it was made "that all inquiries will be made solely for a permissible purpose." The defendants did not perform this promise. Their failure to perform this promise is a breach of contract.

37. The defendants placed in the public domain the information received from W.D.I.A. only after they had received permission of the consumer whose information they obtained to do so. There was no breach of contract in violation of their promises made in paragraph 2 of their agreement. The indemnification clause applies only to the improper use of the information. It does not apply to making unlawful inquiries under false pretenses.

38. The defendants did not pay the bills rendered. The defendants, therefore, breached their agreement in paragraph 5 of the contract. The defendants had no intention of making inquiries for a permissible purpose under the FCRA. Defendants obtained confidential information under false pretenses. They breached their agreements made in paragraphs 1 and 3 of the contract.

39. Rothfeder received a copy of the Fair Credit Reporting Act, provided in the W.D.I.A. application/agreement package, and on June 19, 1989, signed an acknowledgment on behalf of McGraw–Hill that he knew and understood the requirements of the Fair Credit Reporting Act.

40. As part of W.D.I.A.'s application screening process required by 15 U.S.C. § 1681e, W.D.I.A. employed Equifax Investigative Services to conduct an on-site visit to McGraw–Hill offices. Based on the report of

Equifax, W.D.I.A. approved the McGraw–Hill application and gave the defendants access to W.D.I.A.'s service.

41. During a period beginning on July 9, 1989 and ending July 19, 1989, Rothfeder, acting on behalf of McGraw–Hill, used his personal computer to access the credit reports of certain individuals. The individuals included Congressman Richard Durbin, and then Vice–President Dan Quayle, whose credit report Rothfeder obtained from the TransUnion credit bureau on July 19, 1989, utilizing W.D.I.A.'s on-line computer service under the Agreement of June 19, 1987.

42. W.D.I.A. was damaged by defendants' breach of its agreement that all inquiries they will make will be solely for a permissible purpose. As a direct result of defendants' breach of contract and their obtaining information under false pretenses, W.D.I.A. was forced to expend time, effort and expense in repairing its business relationship with TransUnion Corporation, the credit bureau from which McGraw–Hill acquired the Dan Quayle credit report.

43. W.D.I.A. was damaged by defendants' failure to pay bills rendered by W.D.I.A. in that W.D.I.A. had to hire a collection agency to collect the subscription fees which McGraw–Hill owed to W.D.I.A.

44. The W.D.I.A. form contract signed by Rothfeder in June of 1989 as part of his application for subscriber status contains a mutual indemnification provision that provides that W.D.I.A. is indemnified by defendants for "costs and liabilities . . . based upon the improper use by [defendants] of credit information furnished" by W.D.I.A. The indemnification clause does not apply to breaches of contract other than breaches for improper uses.

45. Plaintiff seeks approximately $21,600 in compensation from defendants for three trips taken by its officers after the publication of the article—$3,800 for a trip in plaintiff's private plane to Chicago to meet with TransUnion; $3,800 for a trip in plaintiff's private plane to a congressional hearing in Washington, D.C.; and $14,000 for a trip to a three-day ACB convention, again in plaintiff's private plane, at a resort in Arizona.

46. None of these items of purported damage was revealed to defendants until the very eve of trial, despite repeated attempts by defendants to seek discovery of claimed damages.

47. After the experience of W.D.I.A. caused by the ACB test, the Chicago trip was reasonable and necessary to inform TransUnion personally what was done, to show it the true and accurate documents, to present W.D.I.A.'s perspective that it did everything that it previously said it was going to do to comply with the FCRA after the Connelly test and that it was not negligent or at fault in providing the Dan Quayle report.

48. The purpose of the Washington trip was to tell industry executives W.D.I.A.'s side of the pulling of the Dan Quayle report and explain its side of the situation. W.D.I.A. was advised by Connelly to go to Washington because "[y]ou're going to be damned by the media . . . as a superbureau . . . so you need to be present to tell your story about what you do so that . . . you don't leave it to those who want to tell it in their own way . . . you need to be there to take care of the whole reputation, not just the Dan Quayle incident, but the whole reputation."

49. W.D.I.A. went to the ACB convention because "it was imperative we were out there letting people know from our perspective that we weren't negligent . . . . it's important to be able to look a man eye to eye and show him the facts of a very hot issue . . . to make everybody aware of both sides of it. It was an opportunity to let industry executives know who we were, how we did it, how they did it, and we weren't the bad guys." At the ACB convention, W.D.I.A. was able to discuss the *Business Week* article with many people.

50. The trip to Chicago to meet with TransUnion was caused by defendants' breach of contract and obtaining information by false pretenses.

51. At the meeting in Chicago, Hanna and his lawyer informed TransUnion that W.D.I.A. was the superbureau which had allowed access to TransUnion's file containing the Vice–President's credit report. This

trip was reasonable and necessary for W.D.I.A. to avert being cut off from access to credit information by TransUnion as had occurred previously after the ACB test.

52. W.D.I.A. was not subpoenaed to testify at the Washington hearing, did not testify at the hearing and was never once mentioned by any Congressman, governmental official, or witness in the record of the hearing.

53. The trip to Washington resulted from the publication of the truthful article, not from the breach of contract or fraud.

54. The trip to the three-day ACB convention in Arizona in January 1990, to the extent it related to any act of defendants, was related to and caused by the publication of the *Business Week* article. It was not caused by the breach of contract or fraud.

55. As a direct result of defendants' breach of contract and fraud, W.D.I.A. incurred compensatory damages of $3,860.52 in reasonable and necessary expenses for the Chicago trip and compensatory damages of $150.00 in collecting on the McGraw–Hill account.

56. Defendants did not act with malice or ill will toward W.D.I.A. or with a consciousness that there was a substantial probability that their actions would cause great harm to W.D.I.A. McGraw–Hill and Rothfeder took measures to protect, and believed they were fully protecting, W.D.I.A.'s identity as the on-line superbureau that had been the subject of the *Business Week* test. The testimony explains that the reason for *Business Week*'s decision not to identify W.D.I.A. in the article was

> that the criticism ... was ... of the industry, not of a particular company, and that it would have been unfair to single out a particular company or two particular companies.... We felt that the test was—was to prove a point about the system, not about a particular company.

> Q: And did you identify the area of the country in which W.D.I.A. was located in the article?

> A: No, we did not.

> Q: And why is that?

> A: For the same reason, we didn't want to give any information that would make it possible to identify the company.

> Q: At the time the article was published, did you believe W.D.I.A. would be identified as a result of the article ... as the superbureau that provided Vice–President Quayle's credit report?

> A: No I did not, nor did I believe that the other credit agency would be identified....

> Q: Did you do the story with any sort of intent to harm W.D.I.A.?

> A: No, we did everything that I could think of to not harm them ... and by that I mean we tried to make sure that no one would know who they were.

It is "highly unusual" for *Business Week* not to mention the name of a company it is writing about. Defendants would do so only in a circumstance like this where the purpose of the article was not to draw attention to the company, to harm them in any way, but rather to demonstrate that there were terrible leaks in the system of security. Rothfeder explained that W.D.I.A. was not identified in the article because

> [t]he point was not to point to any particular company that provided the information. The test was of the system. The system turned out to be insecure. That's what we wrote about in the story. The test was not about W.D.I.A., it was not about W.D.I.A., it was not about Allstate.... We wanted to test the system as a whole, and so protecting W.D.I.A.'s name was important....

> Q: Were you trying to hurt W.D.I.A. by doing the story?

> A: Absolutely not.

> Q: Did you think that W.D.I.A. could be identified from the story?

> A: Not at all. There were 25 on-line superbureaus, there were 200 superbureaus at that time, and it would have been impossible to identify them.

57. Rothfeder never identified W.D.I.A. at any time, before or after the publication of the article, to Jean Noonan of the FTC.

58. *Business Week* and its editorial employees who testified at trial did not engage in news gathering conduct of the sort at issue here prior or subsequent to the events underlying this litigation.

To the extent that any of the foregoing Findings of Fact contain any conclusions of law, they shall to that extent be deemed Conclusions of Law, and to the extent any of the following Conclusions of Law contain any findings of fact, they shall to that extent be deemed Findings of Fact.

### CONCLUSIONS OF LAW

1. "The right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to our society as the right to write and to speak without restraint." *Blount v. Smith,* 12 Ohio St.2d 41, 47, 231 N.E.2d 301, 305 (1967).

2. W.D.I.A. has an enforceable right to insist that the agreement of June 19, 1989 be performed by defendants or be compensated for non-performance.

3. The acts for which W.D.I.A. claims damages are the acts of the defendants to obtain information under false pretenses, and their deliberate, willful breach of the Subscriber Agreement entered into by them on June 19, 1989.

4. At the time of filling out the W.D.I.A. application and signing the Subscriber Agreement, McGraw–Hill and Rothfeder did not intend to perform their agreements made with W.D.I.A. in the application and Subscriber Agreement. They did not intend to request information solely for a permissible purpose as defined under the FCRA, 15 U.S.C. § 1681b, or to conform to all provisions of the FCRA. McGraw–Hill, Rothfeder and those in concert with them had no permissible purpose as set forth in the FCRA, to obtain the credit reports of Dan Quayle and Congressman Durbin, yet they did. They obtained information under false pretenses and in breach of their contract with W.D.I.A.

5. The contract required the defendants to indemnify, defend and hold harmless W.D.I.A. from and against any and all costs and liabilities which may be asserted against W.D.I.A. based upon McGraw–Hill's improper use of information. No claims by consumers have been made against W.D.I.A. for the improper use of information. The defendants did not breach this agreement contained in the contract. The indemnification clause has no relevance to this case.

6. When the only relation between the parties is contractual, tort liability must arise out of some positive duty which the law imposes because of the contractual relationship. *Nationwide Mut. Fire Ins. Co. v. Sonitrol, Inc.,* 109 Ohio App.3d 474, 485, 672 N.E.2d 687 (1996). Willful or wanton misconduct on the part of a party to a contract can result in tort liability. *Id.*

7. Rothfeder, acting on behalf of McGraw–Hill, deliberately and wilfully made misrepresentations on the application and during the application process in order to induce W.D.I.A. to enter into the Subscriber Agreement.

8. Rothfeder and McGraw–Hill knew at the time Rothfeder deliberately made misrepresentations to W.D.I.A. on the application and the Subscriber Agreement that the FCRA permits W.D.I.A. to furnish consumer reports only to those subscribers with "permissible purposes" as defined under 15 U.S.C. § 1681b. The misrepresentations of the defendants directly caused W.D.I.A. to violate the FCRA and were material to the transaction. But for the misrepresentations, no agreement would have been entered into between the parties.

9. Rothfeder and McGraw–Hill knew at the time Rothfeder deliberately made the material misrepresentations on the McGraw–Hill application and at the time Rothfeder signed the Subscriber Agreement with W.D.I.A. on behalf of McGraw–Hill that the FCRA makes it a criminal offense for any person to obtain credit information under false pretenses.

10. In spite of having knowledge of the requirements of the FCRA and W.D.I.A.'s obligations under the FCRA, Rothfeder and McGraw–Hill deliberately and wilfully in-

duced W.D.I.A. to enter into the Subscriber Agreement and then used the Agreement to obtain credit information in breach of the Subscriber Agreement and in violation of the FCRA's bar against any person acquiring credit information under false pretenses.

11. In deliberately and intentionally making misrepresentations of material fact to induce W.D.I.A. to enter into the Subscriber Agreement, signing two certifications that the misrepresentations were "true," entering into the Subscriber Agreement so that they could acquire credit information under false pretenses and then using the Agreement to obtain confidential credit information on individuals, knowing they had no permissible purpose and knowingly violating the requirements of the FCRA, Rothfeder and McGraw–Hill fraudulently induced W.D.I.A. to provide credit information to them.

12. McGraw–Hill and Rothfeder are answerable for their wrongful acts if the result is so clearly the natural outcome, in sequence, that they ought to have contemplated it when committing the acts, whether or not they actually did contemplate the harm. *Brayton v. Cleveland Special Police Co.,* 63 Ohio St. 83, 86, 57 N.E. 1085, 1086 (1900).

13. An element of proximate cause is that the harm which results must be such that the actor might anticipate it as likely to happen. *Erie County United Bank v. Berk,* 73 Ohio App. 314, 318, 56 N.E.2d 285, 287 (1943).

14. It is not essential to a recovery of damage that W.D.I.A. prove that McGraw–Hill's and Rothfeder's wrongful acts were the sole and only cause of W.D.I.A.'s harm. *Berk,* 73 Ohio App. at 317, 56 N.E.2d at 287.

15. Generally applicable laws do not offend the First Amendment just because their enforcement against the press has an incidental effect on news gathering. *Cohen v. Cowles Media,* 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991); *Branzburg v. Hayes,* 408 U.S. 665, 682–83, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Associated Press v. NLRB,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 81 L.Ed. 953 (1937).

16. The press is privileged to publish truthful information lawfully obtained. *Cohen,* 501 U.S. at 668–69, 111 S.Ct. 2513;

*Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979); *Cox Broadcasting, Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

17. There is no absolute immunity against civil or criminal liability when the press obtains information through unlawful means. *Scheetz v. Morning Call, Inc.,* 747 F.Supp. 1515, 1525 (E.D.Pa.1990), *aff'd,* 946 F.2d 202 (3d Cir.1991).

18. Because the application of the generally applicable laws regarding fraud and contract do not offend the First Amendment, W.D.I.A. may recover damages for Rothfeder's and McGraw–Hill's breach of contract and fraud without offending the First Amendment. *See e.g., Cohen,* 501 U.S. 663, 111 S.Ct. 2513; *Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 887 F.Supp. 811, 823–24 (M.D.N.C.1995); *Branzburg,* 408 U.S. at 682–83, 92 S.Ct. 2646; *Associated Press,* 301 U.S. at 132–33, 57 S.Ct. 650.

19. Enforcement of generally applicable laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations. *Cohen,* 501 U.S. at 670, 111 S.Ct. 2513.

20. Assessing damages when wrongfully acquired data is purveyed to the multitude chills intrusive acts. It does not chill freedom of expression guaranteed by the First Amendment. *Dietemann v. Time, Inc.,* 449 F.2d 245, 249 (9th Cir.1971).

21. The First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. *Branzburg,* 408 U.S. at 684–85, 92 S.Ct. 2646.

22. Under the principles set out by the Sixth Circuit in *Boddie v. American Broadcasting Cos., Inc.,* 881 F.2d 267, 271 (6th Cir.1989), defendants are not immunized for their wrongful behavior simply because it was undertaken in the name of news gathering. The defendants intentionally engaged in fraud which induced W.D.I.A. to permit access to credit information.

23. A settlement agreement between W.D.I.A. and FTC required W.D.I.A. to re-certify 11,000 subscribers to determine whether or not they met the FTC's guidelines. After the recertification, not a single W.D.I.A. subscriber had to be terminated for failure to meet the FTC's requirements.

24. The recertification which was agreed to by W.D.I.A. cost W.D.I.A. $36,000.00.

25. W.D.I.A. incurred $3,860.52 in reasonable expenses when W.D.I.A. President Mark Hanna traveled to Chicago to confer with TransUnion after defendants' access of the Dan Quayle credit report to avert a cut-off of TransUnion's information service to it as had occurred after Connelly's test of W.D.I.A.

26. W.D.I.A. incurred an expense of $150.00 in collecting the McGraw–Hill account.

■ 27. If a plaintiff acts reasonably in mitigating his damages, the fact that his efforts turn out to be unsuccessful and actually increase the loss does not preclude recovery for all expenses incurred in the process. *Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 598 F.2d 930, 933 (5th Cir. 1979); *Pearlstein v. Scudder & German,* 527 F.2d 1141, 1145 (2nd Cir.1975).

28. In determining whether W.D.I.A.'s conduct fell within the range of reasonableness enabling W.D.I.A. to recover its travel and other expenses relating to mitigation, the Court must consider that the necessity for decisionmaking was thrust upon W.D.I.A. by McGraw–Hill and Rothfeder, and must also consider that judgments made at times of crisis are subject to human error. *M/V Delta,* 598 F.2d at 933.

29. In taking actions to mitigate the damage, W.D.I.A. is not required to be infallible. W.D.I.A. should be permitted a wide latitude in determining how best to deal with the situation thrust upon W.D.I.A. by McGraw–Hill and Rothfeder. *M/V Delta,* 598 F.2d at 933.

■ 30. Travel expenses are recoverable as damages in actions for breach of contract and tort. *M/V Nicole Trahan v. A/S Dampskibsselskabet Svendborg,* 10 F.3d

1190, 1196 (5th Cir.1994); *Corbin,* 908 F.2d at 1150.

31. W.D.I.A. acted reasonably to mitigate its damages when Mark Hanna traveled to Chicago to see TransUnion, a decision thrust on W.D.I.A. and Mark Hanna by defendants' fraud and breach of contract.

32. Under Ohio law:

[W]hen money becomes due and payable ... upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, except that, if a written contract provides a different rate of interest in relation to the money that becomes due and payable, the creditor is entitled to interest at the rate provided in that contract.

O.R.C. § 1343.03(A). (Page's 1997 suppl.)

■ 33. Prejudgment interest compensates a claimant for the period of time between the accrual of the claim and the judgment, regardless of whether the judgment is based on a liquidated or unliquidated claim. *Royal Elec. Constr. Corp. v. Ohio State Univ.,* 73 Ohio St.3d 110, 652 N.E.2d 687, syll. ¶ 1 (1995).

■ 34. Prejudgment interest is founded on the principle that "to make the aggrieved party whole, the party should be compensated for the lapse of time between accrual of the claim and judgment." *Royal Elec.,* 73 Ohio St.3d at 117, 652 N.E.2d 687. Moreover, "[a]ll damages ..., whether liquidated or unliquidated, pecuniary or nonpecuniary, should carry interest from the time the cause of action accrues." *Id.* at 117, 652 N.E.2d 687.

35. The claim for $3,860.52 accrued in September, 1989. Interest on this amount at 10% is $386.00 per year. It is necessary, therefore, to reasonably compensate W.D.I.A. to award interest in the amount of $9 \times \$386.00$, plus $6.43 interest for October and November, 1998 which totals $3,480.43 interest. Additionally, the claim for $150.00 accrued in 1992 and bears an award of interest for six years which totals $9.00 interest.

W.D.I.A. was damaged, therefore, in an additional amount of $3,489.43 pre-judgment interest resulting in a total compensatory damage award of $7,499.95 for breach of contract and fraud against defendants.

36. FTC actions and proceedings, like those of other executive agencies, are entitled to a judicial presumption of regularity and good faith. *Federal Trade Comm'n v. Invention Submission Corp.*, 965 F.2d 1086, 1091 (D.C.Cir.1992), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993); *Federal Trade Comm'n v. Owens–Corning Fiberglas Corp.*, 626 F.2d 966, 975 (D.C.Cir.1980); *see Michigan Dep't of Education v. U.S. Dep't of Education*, 875 F.2d 1196, 1202 (6th Cir.1989). Clear and convincing evidence is required to overcome this presumption. *Ass'n of National Advertisers, Inc. v. Federal Trade Comm'n*, 627 F.2d 1151, 1170 (D.C.Cir.1979). W.D.I.A. failed to produce evidence that the FTC investigation of and proceedings against it were improperly motivated or carried out. The force of the presumption, taken together with the uncontradicted testimony of Noonan and Rothfeder that defendants had nothing to do with the FTC's actions, bar recovery by W.D.I.A. here of the damages it ascribes to those actions.

37. In order to sustain its fraud count, W.D.I.A. had the burden of proving at trial each and every one of the following elements: (1) a representation or concealment of a fact; (2) which was material to the transaction at hand; (3) made falsely, with knowledge of the falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Burr v. Board of County Commissioners*, 23 Ohio St.3d 69, 73, 491 N.E.2d 1101, 1105 (Ohio 1986). W.D.I.A. proved each of the above elements of the fraud cause of action.

38. Proof of proximately caused damages is a necessary element of a claim of fraud. *Adkins v. General Motors Corp.*, 946 F.2d 1201, 1208 (6th Cir.1991). W.D.I.A. was able to demonstrate proximate causation between the acts of the defendants on the one hand and its losses incurred by the trip to Chicago and the collection costs.

39. Justifiable reliance on the claimed misrepresentation is an essential element of a claim for fraud in Ohio. *Logsdon v. Ohio Northern University*, 68 Ohio App.3d 190, 196, 587 N.E.2d 942, 947 (1990).

40. In determining whether reliance is justifiable with respect to a fraud claim, courts consider the various circumstances involved in the particular transaction, such as "the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age and mental and physical condition of the parties, and their respective knowledge and means of knowledge." *Finomore v. Epstein*, 18 Ohio App.3d 88, 90, 481 N.E.2d 1193, 1196 (1984), quoting *Feliciano v. Moore*, 64 Ohio App.2d 236, 241, 412 N.E.2d 427 (1979).

41. The evidence at trial proved that W.D.I.A. did justifiably rely on the material misrepresentations by Rothfeder because he represented a business entity which enjoyed a reputation for truth and fair dealings, McGraw–Hill and *Business Week*. Reliance by W.D.I.A. on representations by Rothfeder about his intention to comply with the FCRA were justified. All parties were required to abide by the law. The suggestion by Dunham does not justify or excuse any of the misrepresentations made by Rothfeder.

42. The plaintiff has proved that the misrepresentations were material to the transaction. No contract would have been entered into but for Rothfeder's misrepresentations.

43. The form contract at issue in this case contains a mutual indemnification clause, providing for indemnification of W.D.I.A. by defendants for costs and liabilities which may be asserted against W.D.I.A. based upon the improper use by defendants of credit information furnished to defendants by W.D.I.A. The courts of Ohio will not construe contract language that is clear and unambiguous on its face. *Logsdon v. Fifth Third Bank of Toledo*, 100 Ohio App.3d 333,

339, 654 N.E.2d 115, 118 (1994). Under this principle, the indemnification clause of the agreement here covers only the breach of the contract for improper use, not for improper acquisition of credit information or obtaining credit information under false pretenses.

44. The only use defendants made of the credit information obtained by W.D.I.A. was in the truthful article, with the full knowledge and permission of that use on the part of each of the persons whose credit information was so used. Such use of credit information is not barred by the FCRA or any other law, and W.D.I.A. has failed to demonstrate that it was improper. The indemnification clause applies only to claims for improper use by consumers. The clause does not apply to other breaches of contract by the parties or to the claim of fraud. The indemnification clause does not provide an exclusive remedy.

45. W.D.I.A. did not waive performance of the terms of the contract concerning FCRA compliance in any respect and are not estopped from enforcing the contract.

46. Under Ohio law, there can generally be no viable action for breach of a contract where the plaintiff cannot show that it has suffered damages flowing from the alleged breach. *See, e.g., Doner v. Snapp*, 98 Ohio App.3d 597, 649 N.E.2d 42, 44 (1994); *Ohio Northern University*, 68 Ohio App.3d at 195, 587 N.E.2d at 946; *Metropolitan Life Insurance Co. v. Triskett Illinois, Inc.*, 97 Ohio App.3d 228, 235, 646 N.E.2d 528, 532 (1994). W.D.I .A. has demonstrated compensable damages flowing from the breach of contract.

47. W.D.I.A. has established damages for breach of contract in the amount of $7,349.95 with reasonable certainty. *See Kinetico, Inc. v. Independent Ohio Nail Co.*, 19 Ohio App.3d 26, 30, 482 N.E.2d 1345, 1350 (1984). W.D.I.A. did not establish its claimed damages for the FTC litigation and compliance expenses were caused by the acts of the defendants in breach of contract or fraud.

48. The trips to Washington and Arizona for which W.D.I.A. seeks compensation from defendants were not proximately caused by the fraud and contract breach committed by the defendants. Those trips were made for reasons unrelated to the breach of contract and fraud. They were made because of the publication of the article. Defendants may not be held liable for expenses so incurred.

49. "[I]n tort actions, the injured party may recover for reasonable expenses necessarily incurred by him as a proximate result of the [claimed] wrongful act, and for the reasonable expenditures made by him in an attempt to avoid or lessen his damages." *Cusumano v. Pepsi–Cola Bottling Co.*, 9 Ohio App.2d 105, 118, 223 N.E.2d 477, 486 (1967). The damages claimed by plaintiff for the cost of the Chicago trip through use of the private plane and collection costs were reasonable and are to be recovered from defendants in this action.

50. Punitive damages are not recoverable in a breach of contract action under Ohio law. *Klusty v. Taco Bell Corp.*, 909 F.Supp. 516, 522 (S.D.Ohio 1995) (collecting cases); *accord, e.g., Battista v. Lebanon Trotting Assoc.*, 538 F.2d 111, 118 (6th Cir. 1976); *Schell v. Kaiser–Frazer Sales Corp.*, 28 Ohio App.2d 16, 16, 274 N.E.2d 315, 315 (1971).

51. Under Ohio statutory law, a plaintiff cannot recover punitive damages in a tort action unless this Court finds that the alleged actions or omissions of the defendants demonstrate malice, aggravated or egregious fraud, oppression, or insult. Ohio Rev.Code Ann. § 2315.21(B)(1)–(2) (Page's 1995), amended 1997. W.D.I.A. did not establish such a state of mind on the part of either defendant.

52. Under Ohio statutory law, a plaintiff must establish by clear and convincing evidence that it is entitled to recover punitive damages. Ohio Rev.Code Ann. § 2315.21(C)(3) (Page's 1995), amended 1997. W.D.I.A. failed to prove by clear and convincing evidence that it is entitled to punitive damages.

53. To obtain an award of punitive damages on a fraud claim, the plaintiff must establish not only the elements of the tort but also the existence of malice or ill will

or that the wrongdoing is particularly gross or egregious. *See Logsdon v. Graham Ford Co.,* 54 Ohio St.2d 336, 339 n. 2, 376 N.E.2d 1333, 1336 n. 2. (1978); *Charles R. Combs Trucking, Inc. v. International Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883 (1984). The "conscious disregard" standard for malice sufficient to warrant punitive damages requires a finding that the defendant acted with a consciousness that the probability of harm was great and that the harm would be substantial. *Preston v. Murty,* 32 Ohio St.3d 334, 336, 512 N.E.2d 1174, 1176 (1987); *see Motorists Mutual Insurance Co. v. Said,* 63 Ohio St.3d 690, 698, 590 N.E.2d 1228, 1234 (1992) *overruled in part on other grounds by Zoppo v. Homestead Insurance Co.,* 71 Ohio St.3d 552, 644 N.E.2d 397 (1994); *("Preston* observed that actual malice requires consciousness of the near certainty ... that substantial harm will be caused by the tortious behavior. Any less callous mental state is insufficient to incur that level of societal outrage necessary to justify an award of punitive damages"); *Calmes v. Goodyear Tire & Rubber Co.,* 61 Ohio St.3d 470, 473, 575 N.E.2d 416, 419 (1991) (punitive damages are intended to punish and deter conduct resulting from a mental state so callous in its disregard for the rights and safety of others that society deems it intolerable). The relevant evidence adduced at trial demonstrates that defendants did not act with the state of mind required under these authorities.

54. As stated by Congress, the purpose of the FCRA is

> to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information ...

15 U.S.C. § 1681(b).

55. "Testers" serve an important role ·in determining whether a statute intended to safeguard the rights of individuals is properly protecting those rights. The use of "testers" has been affirmatively approved by the courts. *See U.S. v. Centennial Builders,*

*Inc.,* 747 F.2d 678, 683 (11th Cir.1984) ("[u]ndercover work is a legitimate method of discovering violations of civil as well as criminal law"); *Grant v. Smith,* 574 F.2d 252, 254 n. 3 (5th Cir.1978) (collecting cases) (noting that the use of testers has been accepted by the courts, tacitly or expressly, as an effective means of obtaining evidence of discrimination). Testers need not be an arm of the governmental agency charged with the law's enforcement. *See Northside Realty Associates, Inc. v. United States,* 605 F.2d 1348, 1354–55 (5th Cir.1979) (evidence of fair housing violations obtained by non-governmental testers who posed as prospective home buyers to check for compliance with the law); *see also Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Bush v. Kaim,* 17 Ohio Misc. 259, 297 F.Supp. 151 (N.D.Ohio 1969) (testimony of testers who made misrepresentations accepted as evidence of discrimination against plaintiffs); *Newbern v. Lake Lorelei, Inc.,* 24 Ohio Misc. 201, 308 F.Supp. 407, 415 (S.D.Ohio 1968) (accepting as evidence of racial discrimination statements made to a white tester).

56. Defendants' test of the credit reporting system does not support an award of punitive damage in this case because it served to inform Congress and the general public about a matter of vital public interest and was done in such a way as to protect the identity of W.D.I.A. and the rights of the consumers. Additionally, defendants are committed to an enlightened philosophy that they will never again engage in similar conduct and will always publish the truth. The need to deter future conduct is not present in this case.

### *VERDICT AND JUDGMENT*

The Court finds in favor of the plaintiff and awards judgment to the plaintiff, W.D.I.A., in the amount of $7,499.95, and its costs. The Court grants post-judgment interest at the federal rate from December 1, 1998.

**IT IS SO ORDERED.**