METROPOLITAN LIFE INSURANCE COMPANY, Appellee,

v.

TRISKETT ILLINOIS, INC., Appellant, et al.

[Cite as *Metropolitan Life Ins. Co. v. Triskett Illinois, Inc.* (1994), 97 Ohio App.3d 228.]

Court of Appeals of Ohio,
Hamilton County.

No. C–930521.

Decided Sept. 21, 1994.

230

Cors & Bassett and *Joseph H. Vahlsing,* for appellee.

*McIntyre, Kahn & Kruse Co., L.P.A.,* and *Robert R. Kracht,* for appellant.

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Hamilton County Court of Common

Pleas, the transcript of the proceedings, and the briefs and the arguments of counsel.

Defendant-appellant, Triskett Illinois, Inc. ("Triskett"), advances on appeal a single assignment of error in which it challenges the entry of judgment for plaintiff-appellee, Metropolitan Life Insurance Company ("Metlife"), on Metlife's complaint seeking payment of the indebtedness evidenced by a promissory note and foreclosure on the mortgage securing the indebtedness and the entry of summary judgment on the counter-claims advanced by Triskett in response to Metlife's complaint. We find no merit to any aspect of this challenge.

The record discloses that in April 1988, Metlife and Triskett entered into a loan agreement, pursuant to which Metlife agreed to lend Triskett $5,400,000 to fund Triskett's purchase of a commercial office park. The loan agreement required Triskett to execute and deliver a promissory note, a mortgage, an assignment of rents and leases, and a security agreement granting Metlife a security interest in certain personal property and fixtures. The note created what is known as a "nonrecourse" obligation, exempting Triskett from personal liability on the note and limiting Metlife's "recourse in any suit for damages or any money judgment * * * to the property * * *." Both the note and the mortgage included an acceleration clause, which provided that the unpaid balance of the note would become due and payable upon an event of default. The note required payment on the first day of each month, and the mortgage and the note, by its incorporation of the mortgage, defined an event of default to include the failure to pay any installment within five days after the payment was due.

Triskett executed and delivered the loan documents in May 1988 and, from June 1988 through May 1990, made the interest-only payments required under the note. Thereafter, the note required monthly installment payments of principal and interest in the amount of $45,038. However, by August 1990, the office park's tenant base had so eroded that cash flow from the property proved insufficient to cover the payments due under the note, and Triskett failed to make its August 1990 payment.

Triskett apprised Metlife's loan servicing agent, Metmor Financial ("Metmor"), of the situation by letter dated August 21, 1990, and therein proposed a modification of the loan terms by which Metlife would agree to accept payments based only on the cash flow generated by the office park until its tenant base was restored. By letter dated August 27, 1990, Metmor informed Triskett that its proposal was "unacceptable" and that any request for a "workout" must be detailed and in writing. Metmor also reminded Triskett that the loan was delinquent and admonished Triskett that it must bring the loan current before Metmor would consider any proposal to modify the terms of the loan and that its failure to bring the loan current by August 31, 1990, could result in legal action.

From August of 1990 through February of 1991, in furtherance of its workout efforts and upon, first, Metmor's and, then, Metlife's request, Triskett provided Metmor with financial and operational information, yet it failed to make payments in accordance with the terms of the note. By letter dated September 18, 1990, Metmor notified Triskett of its default on its August and September 1990 payments and threatened legal action if the loan was not brought current. On December 7, 1990, Triskett tendered a check in the amount of $19,617.58, which represented the cash flow proceeds for August through November 1990. Metlife declined to accept partial payment on the note and subsequently returned the check to Triskett. On December 18, 1990, Metmor notified Triskett of its recommendation to Metlife that it pursue all available legal remedies against Triskett to protect its interest in the property. Triskett countered on January 11, 1991, with a six-item workout proposal, the second item of which proposed that the office park be "listed with an exclusive broker to sell for approximately $6,000,000," provided that Metlife "agree[d] to a payoff without prepayment penalty if such sale [was] consummated." By letter dated February 7, 1991, Metlife informed Triskett of its "conclu[sion] that it [would] be unable to approve [Triskett's] proposed forebearance request," but indicated that it might, "pursuant to item # 2 in [Triskett's] letter, * * * consider [Triskett's] proposal to pay off the balance of the note along with any accrued interest and late charges, if applicable." Finally, by letter dated February 26, 1991, Metlife "advised" Triskett that, "due to [Triskett's] default on the loan, Metlife [was] pursuing legal remedies to protect its interest." Triskett responded by submitting to Metlife a check in the amount of $45,038, dated February 28, 1991. Metlife received the check on March 12, 1991, and credited the amount to the August 1990 payment. Then on March 11 and 12, 1991, Metlife sent Triskett written notice of its election to exercise its right to accelerate the entire indebtedness due on the loan on the basis of Triskett's default.

On March 14, 1991, Metlife filed a complaint in the Hamilton County Common Pleas Court against Triskett, other lien holders of record, and each of Triskett's twenty-five tenants, seeking foreclosure on the mortgage, judgment against Triskett in the amount of $5,800,000, and the appointment of a receiver. This action was ultimately dismissed without prejudice. Then on October 30, 1992, Metlife instituted the action underlying the instant appeal, seeking acceleration and full payment of the indebtedness secured by the mortgage and evidenced by the note, seeking to exercise its rights under the assignment and the security agreement, and seeking the *ex parte* appointment of a receiver. Triskett responded with an answer and an array of "counterclaims" in support of its prayer for rescission of its agreements with Metlife, dissolution of the receivership, and compensatory and punitive damages. On June 3, 1993, the trial court entered summary judgment for Metlife on Triskett's counterclaims and judgment

of foreclosure in favor of Metlife and imposed upon Triskett an "indebted[ness]" in excess of $6,000,000, "without personal recourse against [Triskett]."

■ The standard governing the disposition of Metlife's motion for summary judgment is set forth in Civ.R. 56. Pursuant thereto, a party against whom a claim is asserted may move, with or without supporting affidavits, for summary judgment in his favor on all or any part of the claim. Civ.R. 56(A). A motion for summary judgment may be granted if the court, upon viewing the inferences to be drawn from the underlying facts set forth in the pleadings, depositions, answers to interrogatories, written admissions, and affidavits in a light most favorable to the party opposing the motion, determines (1) that no genuine issue of material fact remains to be litigated, (2) that the moving party is entitled to judgment as a matter of law, and (3) that the evidence demonstrates that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267; Civ.R. 56(C).

■ The right to judgment on a note evidencing the debt secured by a mortgage and the right to foreclose on the mortgage constitute two separate causes of action, one legal and one equitable. *Carr v. Cleveland Trust Co.* (App.1947), 48 Ohio Law Abs. 179, 74 N.E.2d 124. Thus, an action praying for judgment on a note and foreclosure on a mortgage raises two issues. The first issue presents the legal question of whether the mortgagor has defaulted on the note. The second issue entails an inquiry into whether the mortgagor's equity of redemption should be foreclosed. *City Loan & Savings Co. v. Howard* (1984), 16 Ohio App.3d 185, 16 OBR 195, 475 N.E.2d 154; accord *Rosselot v. Heimbrock* (1988), 54 Ohio App.3d 103, 561 N.E.2d 555; *Wheatstone Ceramics Corp. v. Turner* (1986), 32 Ohio App.3d 21, 513 N.E.2d 348.

■ It is beyond cavil that Triskett was in default on the note. The note required payments on the first day of each month and, by its incorporation of the mortgage, defined an event of default to include the failure to pay any installment within five days after payment was due. When Metlife first instituted foreclosure proceedings against Triskett, Triskett was delinquent in its payments for the months of August 1990 through March 1991. Even if, as Triskett contends, Metlife's acceptance of Triskett's February 28, 1991 payment could be construed to constitute a waiver of Triskett's August 1990 default, it cannot be construed to constitute a waiver of Triskett's September 1990 through March 1991 defaults when the mortgage expressly provided that a "waiver * * * of any * * * default * * * shall [not] be deemed or construed to be a * * * waiver * * * of any other * * * default in the performance of the * * * obligations of" Triskett under the mortgage. See *Gaul v. Olympia Fitness Ctr., Inc.* (1993), 88 Ohio App.3d 310,

623 N.E.2d 1281 (holding that a mortgagee's past acceptance of late loan payments does not waive its right to accelerate and foreclose following a subsequent default when the loan documents contain "anti-waiver" provisions). Thus, we answer the initial question of whether Triskett has defaulted on the note in the affirmative.

With respect to the second inquiry and in support of its challenge to the trial court's entry of judgment of foreclosure, Triskett contends that, even if it was in default on the note, the legal and equitable considerations raised in its "counterclaims" preclude the foreclosure of its equity of redemption. We are unpersuaded.

Triskett based its prayer for the rescission of its agreements with Metlife and an alternative prayer for compensatory damages on its claim that Metlife fraudulently induced Triskett to enter into the loan transaction by executing a note containing a nonrecourse provision, when it had no intention of honoring the provision. To establish a right to relief upon a claim of fraudulent inducement to enter into a contract, a claimant must adduce evidence of (1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) an intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 544 N.E.2d 265; *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 514 N.E.2d 709; *Lepera v. Fuson* (1992), 83 Ohio App.3d 17, 613 N.E.2d 1060. The judgment entered below was expressly without personal recourse against Triskett. Therefore, even if we assume satisfaction of the first four elements of Triskett's fraudulent-inducement claim, summary judgment was appropriate for Metlife on the claim when the evidence presented below establishes no causative link between a fraudulent representation made by Metlife and damage sustained by Triskett. See *Logsdon v. Ohio Northern Univ.* (1990), 68 Ohio App.3d 190, 196, 587 N.E.2d 942, 947 (holding that plaintiff's fraud claim failed in the absence of proof of resulting injury).

The issue of causation is also fatal to Triskett's claim that Metlife, by seeking a personal judgment against Triskett in its original common pleas court action, breached the note's nonrecourse provision. To recover on a breach-of-contract claim, the claimant must prove not only that the contract was breached, but that the claimant was thereby damaged. *Munoz v. Flower Hosp.* (1985), 30 Ohio App.3d 162, 168, 30 OBR 303, 309–310, 507 N.E.2d 360, 366; accord *Logsdon, supra*, 68 Ohio App.3d at 195–196, 587 N.E.2d at 946 (holding that damages are not awarded for a mere breach of contract, but for injuries resulting

therefrom). Therefore, even if we assume that Metlife breached the nonrecourse provision, summary judgment was properly entered for Metlife on Triskett's breach-of-contract claim in the absence of proof that Triskett was thereby damaged.

Triskett fares no better with its claim that Metlife, by instituting its foreclosure action and seeking the appointment of a receiver, tortiously interfered with Triskett's business relationships with its lenders, vendors and tenants. A claim for tortious interference with an economic or business relationship requires proof that one, without privilege to do so, induced or otherwise purposely caused a third party not to enter into or continue a business relationship or not to perform a contract with another. *Elwert v. Pilot Life Ins. Co.* (1991), 77 Ohio App.3d 529, 602 N.E.2d 1219. The record before us is devoid of evidence that Metlife, in exercising its contractual rights to foreclosure and the appointment of a receiver, detrimentally interfered with Triskett's third-party business or contractual relationships or that it acted with the intention to do so and is supportive of a determination that Metlife's conduct, whatever its practical effect on Triskett's third-party relationships, was privileged. See *Elwert, supra,* at 539, 602 N.E.2d at 1226 (citing *Juhasz v. Quik Shops, Inc.* [1977], 55 Ohio App.2d 51, 57, 9 O.O.3d 216, 219, 379 N.E.2d 235, 239, for the proposition that purposeful interference with a third-party business relationship is privileged if undertaken in good faith to protect properly a legally protected interest which might otherwise be impaired or destroyed); *Contadino v. Tilow* (1990), 68 Ohio App.3d 463, 589 N.E.2d 48 (holding that a claim for tortious interference with a third-party contract requires proof of a causal connection between the alleged interference and a breach of the contract). Therefore, summary judgment was properly entered for Metlife on Triskett's tortious-interference claim.

Equally untenable is Triskett's contention that Metlife, by seeking and obtaining the *ex parte* appointment of a receiver, effectuated a prejudgment attachment of Triskett's property in contravention of the constitutionally mandated notice and hearing requirements imposed under R.C. 2715.01 *et seq.,* and deprived Triskett of its property under color of law and without due process in contravention of the Fifth and Fourteenth Amendments. The appointment of the receiver in the proceedings below did not, as Triskett asserts, constitute a prejudgment attachment subject to the strictures of R.C. 2715.01 *et seq.,* but was accomplished pursuant to and in accordance with R.C. 2735.01(B) and the terms of the mortgage. Although courts have imposed a requirement that notice be given prior to the appointment of a receiver pursuant to R.C. 2735.01(B), the pre-appointment notice requirement was not, in this instance, transgressed when such notice may be and was waived by Triskett under the mortgage. See *Manufacturers Life Ins. Co. v. Patterson* (1988), 51 Ohio App.3d 99, 554 N.E.2d 134.

Therefore, summary judgment was appropriate for Metlife on Triskett's constitutionally based claims premised upon the *ex parte* appointment of a receiver.

 Triskett also sought to recover, either by interposition of the defense of recoupment or upon the theory of unjust enrichment, amounts expended in connection with its acquisition of the office park and over the course of the loan. We hold that Triskett was properly precluded from interposing the defense of recoupment to offset the judgment entered for Metlife to the extent of such expenditures when Triskett failed to demonstrate that it incurred those expenditures as a result of Metlife's failure to comply with its obligations under their agreements. See *Riley v. Montgomery* (1984), 11 Ohio St.3d 75, 77, 11 OBR 319, 320–321, 463 N.E.2d 1246, 1248–1249; *Cauffiel Machinery Co. v. Eastern Steel & Metal Co.* (1978), 59 Ohio App.2d 1, 5, 13 O.O.3d 41, 43, 391 N.E.2d 743, 746 (quoting 20 American Jurisprudence 2d 235, Counterclaim, Recoupment, and Setoff, Section 11, to the effect that "recoupment['s] * * * proposition is that the plaintiff's claim is based on a particular contract or transaction and that to entitle the plaintiff to the sum claimed, he must prove compliance with certain obligations of the contract; that he failed to do so; and therefore that the defendant has been so damaged in the transaction that the plaintiff is not entitled to recover"). We also hold that such expenditures were not recoverable, and that summary judgment was properly entered for Metlife, on Triskett's unjust-enrichment claim when Metlife retained only those benefits to which it was entitled under the terms of its agreements with Triskett and the record is devoid of evidence of fraudulent, illegal or bad-faith conduct on the part of Metlife. See *Eyerman v. Mary Kay Cosmetics, Inc.* (C.A.6, 1992), 967 F.2d 213; *Creighton v. Toledo* (1869), 18 Ohio St. 447; *Cincinnati v. Cincinnati Reds* (1984), 19 Ohio App.3d 227, 19 OBR 378, 483 N.E.2d 1181 (holding that a relationship defined by express contract may not be redefined under a theory of quasi-contract and unjust enrichment in the absence of fraud, illegality or bad faith).

 The alleged incidents of misconduct on the part of Metlife that provided the fundament for Triskett's fraudulent-inducement, unjust-enrichment and constitutionally based counterclaims are again asserted (and again without success) in support of its counterclaim charging that Metlife breached its obligation, imposed under R.C. 1301.09, to act in "good faith in its performance or enforcement" of their agreements.[1] Triskett's claim that Metlife breached its

---

1. Unlike the court in *Gaul, supra,* we do not read R.C. 1309.04(I) to absolve the parties to a financing "transaction involving real property" of the duty imposed under R.C. 1301.09 to conduct their transaction in good faith. See *id.,* 88 Ohio App.3d at 319–320, 623 N.E.2d at 1287. R.C. 1301.09 imposes a duty of good faith upon, *inter alia,* the parties to a negotiable instrument, see R.C. Chapter 1303; *Gem Savings Assn. v. Aqua Sportsman, Inc.* (Aug. 12, 1992), Hamilton App. No. C–910361, unreported, 1992 WL 192500, while R.C. 1309.04(I), by

238

implied duty of good faith by fraudulently inducing Triskett to enter into the loan transaction fails in its central premise when, as we determined *supra*, summary judgment was properly entered for Metlife on Triskett's fraudulent-inducement claim. The absence of a causative link is again fatal to Triskett's claim that Metlife breached its duty of "good faith" (defined under R.C. 1301.01[S] as "honesty in fact in the conduct or transaction concerned") by causing Triskett to incur expenditures in connection with its purchase of the office park and over the course of the loan, when Triskett has failed to demonstrate that it incurred those expenditures as a proximate result of dishonesty on the part of Metlife. Equally untenable is Triskett's claim that Metlife breached its duty of good faith by obtaining the *ex parte* appointment of a receiver, when the decision of a lender in an arm's-length commercial transaction to enforce its contractual rights does not constitute an act of bad faith. *Gaul, supra; Bennco Liquidating Co. v. Ameritrust Co. Natl. Assn.* (1993), 86 Ohio App.3d 646, 621 N.E.2d 760; *First Fed. S. & L. Assn. of Akron v. Cheton & Rabe* (1989), 57 Ohio App.3d 137, 567 N.E.2d 298.[2] Finally, Triskett's contention that Metlife breached its implied duty of good faith by engaging in protracted negotiations which misled Triskett into anticipating a workout is obviated by the correspondence between the parties, which reflects Metlife's insistence, from the outset, that Triskett either bring the loan current or face legal action. Accordingly, we hold that summary judgment was properly entered for Metlife on Triskett's counterclaim charging that Metlife breached its implied duty of good faith.

Upon our determination that judgment was properly entered for Metlife on its complaint seeking judgment on the note and foreclosure on the mortgage and that summary judgment was properly entered for Metlife on Triskett's counter-

its very terms, operates only to exempt real property transactions from the provisions of R.C. Chapter 1309, which governs secured transactions.

**2.** See, also, *Kham & Nates's Shoes No. 2, Inc. v. First Bank of Whiting* (C.A.7, 1990), 908 F.2d 1351, 1357 ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' * * * [T]he obligation of good faith that exists in every contractual relation * * * is not an invitation to [a] court to decide whether one party ought to have exercised privileges expressly reserved in the document. 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of [a contract's] drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith—such as the UCC's standard of honesty in fact * * *—fill the gap. They do not block use of terms that actually appear in the contract.") Contra *K.M.C. Co., Inc. v. Irving Trust Co.* (C.A.6, 1985), 757 F.2d 752 (holding that a lender's discretion to advance funds under a financing agreement is subject to an implied obligation of good faith which, despite the absence of an express contractual provision, imposed upon the lender a duty to notify the borrower before refusing to advance funds under the financing agreement up to the maximum credit limit).

claims, we overrule the sole assignment of error advanced on appeal and affirm the judgment of the trial court.

*Judgment affirmed.*

KLUSMEIER, P.J., GORMAN and M.B. BETTMAN, JJ., concur.