RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――――

KATHLEEN A. MCCARTHY,

*Plaintiff-Appellant,*

*v.*

No. 12-4510

AMERITECH   PUBLISHING,   INC.,   dba   AT&T
Advertising  Solutions  and  AT&T  Advertising  &
Publishing, Inc.; AT&T INC.;

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton
No.  3:10-cv-00319—Thomas M. Rose, District Judge.

Argued:  March 20, 2014

Decided and Filed:  August 13, 2014

Before:  BOGGS, SILER, and GIBBONS, Circuit Judges.

―――――――――――――

**COUNSEL**

**ARGUED:**  David C. Greer, BIESER, GREER & LANDIS, LLP, Dayton, Ohio, for Appellant.
Terrence J. Miglio, KELLER THOMA, P.C., Detroit, Michigan, for Appellees.  **ON BRIEF:**
Karen T. Dunlevey, Gretchen M. Treherne, BIESER, GREER & LANDIS, LLP, Dayton, Ohio,
for Appellant.  Terrence J. Miglio, Barbara E. Buchanan, KELLER THOMA, P.C., Detroit,
Michigan, for Appellees.

————————————

**OPINION**

————————————

JULIA SMITH GIBBONS, Circuit Judge.   Kathleen McCarthy worked at Ameritech Publishing, Inc. (API), a wholly owned subsidiary of AT&T, until API terminated her position in August 2008.  She sought to retire at that time to care for her ailing husband, but API allegedly told her that she was not eligible to receive post-retirement healthcare benefits—benefits on which her husband depended.  She therefore elected to continue working at API for another nine months through API's Employment Opportunity Pool, a program designed to permit longtime employees to retain their benefits while searching for other job opportunities.  When McCarthy turned sixty-five, she retired with benefits.  She then brought this suit alleging, among other things, age and sex discrimination in connection with the termination of her position.  After API admitted that McCarthy was, in fact, entitled to post-retirement healthcare benefits when API terminated her position in August 2008, she amended her suit to add a claim for fraudulent inducement.  The district court awarded summary judgment to API and AT&T on the merits of each claim.  We affirm in part and reverse in part.

**I.**

Kathleen McCarthy began her career in the Dayton, Ohio, office of a company called Berry in 1990.  API, a telephone directory publisher, acquired Berry (or at least McCarthy's section of the company) sometime thereafter, and in 2007 AT&T acquired API as part of a larger corporate acquisition.  McCarthy was a "very good" employee who got along with her colleagues and received "very positive" feedback.  Her career at API survived the AT&T acquisition and spanned nearly twenty years.  But in August 2008, less than two years shy of the twenty-year mark and less than one year shy of her sixty-fifth birthday, API informed McCarthy that her position would be eliminated due to evolving business needs.  She challenges several aspects of her termination, and to understand the nature of her complaint, we must burrow into API's corporate structure and processes.

API's Dayton office housed about thirty employees in various groups, including a Sales Unit and a Publishing and Design Unit. As of July 2008, eleven of the thirty employees were classified as "Staff Associate III" employees. These Staff Associate III employees supported the sales representatives and were divided into two categories: "crew clerks" and "publishing account representatives" (PARs). The crew clerks provided pre-sales support and reported to the Sales Unit; the PARs provided post-sales support and reported to the Publishing Unit. McCarthy was a PAR and thus worked on the publishing side.

The allegations in this case revolve around a "force adjustment" or "surplus"—the parties use the two terms interchangeably to mean a layoff. Force adjustments at API were governed by a 2005 collective bargaining agreement (CBA) negotiated by API and the Communication Workers of America. According to the CBA, force adjustments had to target the least senior employee among the "regular employees performing essentially the same type of work, by location within a departmental unit of the bargaining unit." The CBA defined "departmental unit" to mean "the work units, locations and/or job classifications shown in Exhibit B and any future units created within those locations." Exhibit B to the CBA listed eleven locations, including Dayton, and the following "work units":

- Premises Sales
- Telephone Sales
- Art
- Service/Claims Bureau
- Publishing Production, Administrative Services, Sales Support, Market Control, Market Support, NYPS
- Corporate Graphics Center
- Outbound Calling Team

The decision to implement a force adjustment came from API's senior management at its corporate headquarters in St. Louis. The corporate office would determine the number of employees to be dismissed within each departmental unit and location. Regional or local officials played no part in that decision; they merely implemented the directive by selecting the individuals to be laid off based on the seniority of the employees within the respective departmental unit.

Once the corporate office mandated a force adjustment, involuntary layoffs could be avoided only through a process called the Supplemental Income Protection Plan—colloquially called the Interest in Leaving program. When API announced a force adjustment, employees within the affected locations and departmental units could "elect, in order of seniority, and to the extent necessary to relieve the surplus, to leave the service of the Company and receive Supplemental Income Protection Plan benefits." If, for example, API announced that two positions in the Premises Sales Unit of the Dayton office would be eliminated in a force adjustment, and API informed the two least senior employees in that unit that they would lose their jobs, up to two other employees in the Dayton office's Premises Sales Unit could volunteer to leave API and receive certain defined benefits, obviating the need to conduct layoffs and thus permitting the two "surplused" employees to keep their jobs. Any time a force adjustment occurred, an Interest in Leaving process also occurred in conjunction with that force adjustment.

Those processes are, more or less, what precipitated this lawsuit. In mid-2008 API announced a force adjustment in the Dayton office. The company's sales and revenue had started to drop, and senior managers decided to consolidate and centralize various business units. API's corporate headquarters instructed managers in the Dayton office to eliminate various positions, including three Staff Associate III positions. But the corporate directive did not identify them as Staff Associate III positions; the directive was more specific, instructing the office to eliminate one crew clerk position and two PAR positions. Consistent with the CBA, API managers in Dayton then identified the specific individuals whose positions would be eliminated: Bill Chestnut, the least senior crew clerk, and McCarthy and Angela Saylor, the two least senior PARs.

Before implementing the force adjustment, API solicited volunteers for the Interest in Leaving program. None of the PARs volunteered for the program, but two crew clerks in the Sales Unit, Judy Oiler and Phyllis "Jean" Hogan, elected to participate. That allowed API to preserve Chestnut's position. But it also opened the question whether to permit both volunteers to participate in the Interest in Leaving program. The CBA capped the number of volunteers in the Interest in Leaving program at the number of positions being eliminated within the respective

unit, so the agreement arguably barred API from permitting more than one crew clerk to participate in the Interest in Leaving program.

Despite the contractual limitation, API chose to permit both Oiler and Hogan to participate in the Interest in Leaving program because it would allow API to "save one more job within the Dayton office" by transferring either Saylor or McCarthy—the two PARs whose positions were being eliminated because of their lesser seniority—to the vacant crew clerk position. Because Saylor was more senior than McCarthy, Saylor's position would be saved. But Saylor did not want to change positions, and management was eager to keep her in her PAR position because she was an exemplary member of that team. API devised a solution: Gloria Smith, a more senior PAR, had been "struggling with her position." API managers in Dayton therefore "approached Gloria and asked her if she would feel better about the crew clerk position or the PAR position," and when Smith said she would prefer the crew clerk position, API moved her to that group, allowing Saylor to remain as a PAR.

McCarthy then filed a formal grievance. She was upset that she was losing her job while more junior crew clerks, including Chestnut and Roark Plummer, were being permitted to keep their positions. Both crew clerks and PARs were classified as Sales Associate III employees, she reasoned, so she should be able to "bump" a less senior crew clerk. She thought the CBA contemplated bumping of that sort. Apparently other PARs shared McCarthy's concern, as some others—possibly *all* of the other PARs—asked API managers whether more senior PARs could bump less senior crew clerks. But Gary Winkler, the API manager responsible for interpreting the 2005 CBA, determined that, under that agreement, PARs could not bump crew clerks. In light of Winkler's position, the union declined to pursue the grievance on McCarthy's behalf, instead committing to pursue the issue during the next round of collective bargaining.

API provided McCarthy with two options. First, she could leave API and receive a termination payment of $38,770, an amount derived from a contractual formula that accounted for her wage and experience. If she elected to receive this termination payment, McCarthy was told, she would not be eligible to receive certain benefits, nor would she continue to accrue service time for pension purposes. In the alternative, McCarthy could opt into API's Employment Opportunity Pool. The CBA provided that employees with more than five years of

service whose positions were eliminated through a force adjustment could opt into the Employment Opportunity Pool and "work at 85% of their regular base wage while continuing their job search." Employees who opted into the Employment Opportunity Pool would continue to receive healthcare benefits while they remained in the pool and would continue to accrue service time for pension purposes. Employment Opportunity Pool participants also received "priority consideration for lateral and demotional moves." An employee's participation in the Employment Opportunity Pool automatically ended if (1) the employee turned down a work assignment, (2) the employee received payments through the pool equal to the amount of the termination payment to which the employee would have been entitled had the employee chosen not to participate in the pool, or (3) the employee voluntarily left the pool and collected the unpaid balance of his or her termination payment.

At the time McCarthy faced this choice, her husband was "critically ill," and it was imperative that she keep her healthcare benefits. After McCarthy met with her supervisor to discuss her options, she called someone who she claims was a Fidelity retirement specialist[1] to determine whether she could retain her healthcare benefits if she elected to retire rather than opt into the Employment Opportunity Pool. According to McCarthy's deposition testimony, she received welcome news from a retirement specialist named Cortesa: McCarthy "could retire with benefits, excluding vision and [her] husband's life insurance policy." But an API employee named Mary Smith questioned the accuracy of Cortesa's pronouncement. McCarthy therefore telephoned other retirement specialists several more times that week, and each time she was assured that she could retire with healthcare benefits. David Evans, an API manager, testified that he knew about these conversations and also knew that the retirement specialists consistently told McCarthy "that, indeed, she was eligible to retire with medical benefits."

On July 23, 2008, McCarthy's supervisor, David Zawisa, participated in one of her telephone conversations with a retirement specialist named Bill. The retirement specialist again reiterated that she could retire immediately with full healthcare benefits, excluding vision

---

[1]There is some dispute about whether the persons with whom McCarthy spoke were, in fact, Fidelity retirement specialists. Fidelity evidently administered API's pension and savings plan, and another company, Aon Hewitt, administered the eligibility and enrollment process for API's "Health and Welfare Plan." But some API literature seems to indicate that Fidelity retirement specialists were responsible for fielding questions about both programs.

benefits and her husband's life insurance policy. According to Zawisa's subsequent recount of the conversation, Bill explained that most API employees were eligible to retire with full healthcare benefits when they qualified under the so-called Modified Rule of 75—*i.e.*, when the employee was sixty-five years old and had worked at the company for ten years, or when the employee was sixty years old and had worked at the company for fifteen years. Because McCarthy joined API through its acquisition of Berry, however, Bill explained that she was eligible for full healthcare benefits under the Original Rule of 75—*i.e.*, when any combination of age and experience totaled seventy-five. Bill advised McCarthy to contact another Fidelity employee to obtain documents explaining her eligibility under the Original Rule of 75.

The benefits saga continued. Zawisa spoke with various API managers, including Dwight Cameron, API's lead labor-relations manager. Cameron insisted that McCarthy was *not* eligible to receive post-retirement benefits. Zawisa conveyed that information to McCarthy in subsequent conversations, specifically instructing her that Fidelity's assurances were inaccurate and that she could not retire with benefits at that time. Afraid that she would be left without healthcare benefits if she retired, McCarthy signed the Employment Opportunity Agreement and opted into the Employment Opportunity Pool, ensuring her continued receipt of healthcare benefits and accrual of service time so that she could retire with healthcare and pension benefits when she reached the age of sixty-five the following year.

McCarthy received lower wages after she signed the Employment Opportunity Agreement, but her job duties did not change: She continued to work for the same people, doing the same tasks, during the same hours. In the meantime, she accessed API's job site to search for another job within the company, but only one job was listed on that site: a crew clerk position. That job then "disappeared from the site." McCarthy turned sixty-five in May 2009 and retired. Because she retired before she had exhausted her termination payment, she received the balance of that amount upon her departure from API.

Another force adjustment occurred in 2009, after McCarthy's retirement. At that time, a union representative named Dan Frazier told Winkler, the API manager responsible for interpreting the CBA, that, in Frazier's opinion, all Staff Associate III positions—*i.e.*, both crew clerks and PARs—were essentially the same position. Frazier therefore believed that crew clerks

and PARs should be grouped together for purposes of calculating seniority, rather than dividing Staff Associate IIIs into the two subgroups. McCarthy's position should not have been eliminated, Frazier thought, because McCarthy had greater seniority than the crew clerks who retained their positions. In Winkler's view, however, the CBA required API to differentiate between crew clerks and PARs for purposes of seniority. Winkler subsequently discussed the issue with his boss, who brought it to the attention of legal officers and senior management in St. Louis. API then decided to change course and to treat all Staff Associate IIIs as one group when calculating seniority during force adjustments. Because of the interpretive change, API permitted Angela Saylor to bump Bill Chestnut during the 2009 force adjustment.

McCarthy filed suit against API in federal district court in August 2010. What began as a discrimination suit was expanded to include a fraud action after evidence suggested that API may have inaccurately informed McCarthy in July and August 2008 that she was not eligible for post-retirement healthcare benefits. McCarthy's amended complaint, which retains the original allegations of discrimination, also sets forth assorted other claims, both state and federal, statutory and common law. Her second amended complaint, filed in July 2012, included eight counts: (1) unlawful age discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a); (2) unlawful sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and section 4112.02 of the Ohio Revised Code; (3) failure to furnish plan documents as required under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1024(b)(4), 1025(a), and 1132(c)(1)(B); (4) wrongful denial of health and retirement benefits in violation of 29 U.S.C. § 1132(a)(1)(B); (5) fraudulent inducement to sign the Employment Opportunity Agreement; (6) unpaid minimum wages in violation of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206; (7) promissory estoppel; and (8) unjust enrichment. McCarthy added AT&T as a defendant in 2011.

In a November 2012 opinion the district court granted the defendants' motion for summary judgment and denied McCarthy's motion for partial summary judgment. The court held that (1) McCarthy could not establish a *prima facie* case of age or sex discrimination and also had not adduced evidence that API's proffered legitimate reason for her termination was pretextual, (2) McCarthy's requests for documents related to her post-retirement healthcare plan

were not sent to the correct recipient and thus were not governed by ERISA, (3) McCarthy had not established a *prima facie* case of fraudulent inducement because she had not adduced evidence of a false representation, (4) API paid wages to McCarthy between August 2008 and May 2009 and therefore did not violate the FLSA, (5) McCarthy did not make out a claim of promissory estoppel for the same reason she failed to state a viable fraudulent-inducement claim, and (6) McCarthy could not bring an unjust-enrichment claim because an express contract governed her relationship with API.  McCarthy timely appealed.

## II.

McCarthy does not abandon any of her claims on appeal, but she focuses primarily on count five, which accuses API of fraudulently inducing her to sign the Employment Opportunity Agreement.  We begin there.

### A.

McCarthy alleges that API fraudulently induced her to execute the Employment Opportunity Agreement and to participate in the Employment Opportunity Pool rather than to retire in August 2008.  The defendants dispute the merits of McCarthy's claim and also suggest the claim is preempted by ERISA.[2]  The two arguments are addressed in turn.

#### 1.

An Ohio plaintiff claiming fraudulent inducement to enter into a contract "must adduce evidence of (1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) an intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a

---

[2]As a third basis for affirmance of the district court's award of summary judgment, the defendants contend that McCarthy failed to plead her allegations of fraud with particularity, as required by Federal Rule of Civil Procedure 9(b).  But Rule 9(b) imposes a pleading requirement, *see Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010), and challenges to the sufficiency of the pleadings must be asserted in a motion to dismiss under Rule 12(b)(6) rather than on summary judgment, *see Spadafore v. Gardner*, 330 F.3d 849, 852–53 (6th Cir. 2003).  The principal purpose of Rule 9(b) is to ensure that the complaint provides the "minimum degree of detail necessary to begin a competent defense," *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008), and this is not the appropriate time for the defendants to contest whether McCarthy's complaint provided adequate notice. *See Cable & Computer Tech. Inc. v. Lockheed Sanders, Inc.*, 214 F.3d 1030, 1038 (9th Cir. 2000).

right to rely; and (5) injury proximately caused by the reliance." *Metro. Life Ins. Co. v. Triskett Ill., Inc.*, 646 N.E.2d 528, 532 (Ohio Ct. App. 1994).

A couple of things are not in dispute. API now acknowledges that McCarthy was in fact eligible to receive post-retirement healthcare benefits in August 2008, when she was given the option to retire or to enter the Employment Opportunity Pool. And no one disputes that API's alleged representations about McCarthy's eligibility for post-retirement healthcare benefits were material to her decision to sign the Employment Opportunity Agreement: She offered uncontroverted testimony that she would have chosen to retire in August 2008, rather than participate in the Employment Opportunity Pool, had API told her that she and her husband would receive post-retirement healthcare benefits.

The initial question is whether a rational jury could conclude that API managers told McCarthy that she was not eligible for post-retirement healthcare benefits in July and August 2008. Ample evidence indicates that the answer is yes. McCarthy asked her supervisor, David Zawisa, to join her on a call with a Fidelity retirement specialist on July 23, 2008. The purpose of the call, according to Zawisa's deposition testimony, was to determine McCarthy's "eligibility for full health benefits (excluding vision) when she retires." The Fidelity specialist reiterated the conclusion previously reached by several other Fidelity representatives: McCarthy could retire and receive post-retirement healthcare benefits, although she would lose her vision insurance and her husband's life insurance policy. Despite these assurances, however, McCarthy testified that, after the call, Zawisa came to her desk and flatly said she could not retire with benefits. Several pieces of evidence corroborate McCarthy's testimony. When McCarthy submitted an executed copy of the Employment Opportunity Agreement on August 14, 2008, she included a handwritten notation accusing API of repeatedly denying her eligibility for post-retirement benefits. Zawisa also acknowledged that he told McCarthy, at the behest of Bruce Piombo and Dwight Cameron, two senior API managers, that she could not retire with benefits, regardless of what the Fidelity retirement specialists told her.

In a vain effort to establish that this testimony does not constitute evidence of a false representation, API tries to distinguish between healthcare and pension benefits. In its view the API managers interacting with McCarthy might not have been discussing healthcare benefits;

rather, they could have meant that McCarthy was not entitled to retire with *pension* benefits. But David Evans knew that McCarthy was speaking with Fidelity to determine whether she was "eligible to retire with medical benefits." And Zawisa acknowledged in a July 2008 email that the conversations about McCarthy's benefits related to her healthcare benefits. He also admitted in his deposition that he was "involved in the discussions about whether or not Kathleen was eligible to retire with medical benefits, as of August of 2008." The facts established by the record clearly create a genuine issue as to whether McCarthy was told in August 2008 that she could not retire with healthcare benefits at that time.

McCarthy also has adduced evidence that API managers displayed an utter disregard for the truth when they denied her eligibility for post-retirement healthcare benefits in July and August 2008. Although numerous Fidelity representatives informed McCarthy that she was eligible for post-retirement healthcare benefits, a jury could reasonably conclude that API told McCarthy that she was not eligible. Zawisa participated in the July 23 conference call with McCarthy and "Bill," the Fidelity retirement specialist who explained that McCarthy was eligible for post-retirement healthcare benefits under the Original Rule of 75, rather than the Modified Rule of 75 that applied to most API employees, because she had joined API through its acquisition of Berry. Zawisa summarized that call in an email sent to Piombo immediately after the call ended. Accordingly, both Zawisa and Piombo had reason to believe that McCarthy was eligible for post-retirement healthcare benefits in August 2008.

It is not clear whether anyone relayed the details of this telephone conversation to other API managers, including Cameron. But even if Cameron never heard of the conversation, he nevertheless learned of McCarthy's eligibility the following month. On August 6, 2008, Cameron sent an email to Tami Honda, a senior AT&T human resources manager, asking her to investigate why Fidelity repeatedly told McCarthy that she was "service-pension eligible." Honda replied that same afternoon and said that, according to "the Fidelity escalation team," McCarthy would not be "eligible for a service pension" until May 2009. Less than one week later, Cameron sent another email to Honda in which he wrote, "McCarthy spoke with Fidelity again yesterday and was told that she is eligible for a service pension due to her service with LM Berry." Then, on August 19, 2008, Honda sent an email to Cameron and Zawisa stating that

McCarthy "<u>is eligible</u> for <u>retiree</u> <u>healthcare</u> under a grandfather rule for APVI/LMBerry." Thus, even if we assume that Cameron did not know of McCarthy's eligibility in July 2008 when he instructed Zawisa to tell McCarthy that she was not eligible, Cameron learned of McCarthy's eligibility one month later—just a few days after she signed her Employment Opportunity Agreement. And yet neither Cameron nor Zawisa appears to have told McCarthy about Honda's email. In Ohio such silence is sufficient to give rise to a claim for fraudulent inducement.

Ohio law imposes a duty to disclose material information "'when one party has information that the other [party] is entitled to know because of a fiduciary *or other similar relation of trust and confidence between them.*'" *Showe Mgmt. Corp. v. Kerr*, No. 83406, 2004 WL 1118819, at ¶ 32 (Ohio Ct. App. May 20, 2004) (emphasis added) (quoting *State v. Warner*, 564 N.E.2d 18, 40 (Ohio 1990)); *see also* Restatement (Second) of Torts § 551(2)(c) (1977) (stating that a party to a business transaction has a duty to disclose "subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so"). Cameron and Zawisa were API managers who enjoyed a special relationship of trust and confidence with McCarthy; she relied on them for accurate information about her eligibility for post-retirement healthcare benefits. Yet when Cameron and Zawisa discovered on August 19 that their prior representations to McCarthy may have been misleading, they allegedly concealed that fact from McCarthy even though they knew she had relied on their representations when she elected to sign the Employment Opportunity Agreement. That the revelation occurred after McCarthy signed the agreement is of no consequence. Had Cameron or Zawisa informed McCarthy of her eligibility on August 19, after she signed the agreement, the CBA still would have permitted her to retire on that date and to receive her entire termination payment, along with the post-retirement healthcare benefits for which she was eligible. McCarthy thus has adduced sufficient evidence of the first two elements of her fraudulent-inducement claim to survive summary judgment. *See Metro. Life Ins. Co.*, 646 N.E.2d at 532.

A more difficult question is whether McCarthy has adduced evidence that API made its various representations with the intent to induce her to enter the Employment Opportunity Pool. McCarthy argues that this is a question for the jury, which might infer that API sought to induce

her to join the pool so that they could obtain the benefit of her services without having to pay her. That is true to a degree: State of mind is typically determined by a jury. *Bonner v. Metro. Life Ins. Co.*, 621 F.3d 530, 536 (6th Cir. 2010). But to survive summary judgment McCarthy must identify evidence that would permit a rational trier of fact to infer that API had the requisite intent. *See Anderson v. Inland Paperboard & Packaging, Inc.*, 11 F. App'x 432, 437 (6th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

One significant fact weighs in favor of McCarthy's argument: She could have retired with benefits and a lump-sum termination payment in August 2008, and instead she continued to work until May 2009 without receiving additional compensation. The wages API paid to McCarthy between August 2008 and May 2009 were funds she would have received anyway had she simply retired in August 2008. API thus received nine months of free labor from McCarthy.[3] The question is whether a rational factfinder could conclude that this free labor motivated API's alleged decision to feed McCarthy inaccurate information about her eligibility for post-retirement healthcare benefits in July 2008 (or motivated API's decision not to inform McCarthy of its prior error when API finally established that McCarthy was eligible for benefits). There is no direct evidence in the record to establish that API intentionally or recklessly provided inaccurate information to McCarthy to obtain her free labor, but the significant benefit that accrued to API as a result of its misinformation (and its silence) are sufficient to send the question to the jury.

That leaves the final two elements of fraudulent inducement: justifiable reliance and injury. API does not contest the existence of an injury but maintains that there is no evidence that McCarthy relied on its representations with respect to her eligibility for post-retirement healthcare benefits. API points to a section of McCarthy's personal notes in which she "indicate[d] she was told by Zawisa that she 'could not retire with benefits' on August 30, 2008, six days after she signed the [Employment Opportunity] Agreement." But API ignores testimony and documentary evidence showing that Zawisa gave her the same information before she signed the Employment Opportunity Agreement. McCarthy repeatedly testified that she only

---

[3]Rhonda Stone, who was responsible for determining pension eligibility at API, testified that McCarthy's ultimate pension payout increased by $20,000 due to the extra nine months of service. McCarthy apparently does not dispute that fact.

signed the agreement because API insisted she would not receive healthcare benefits if she retired in August 2008. And the mere fact that McCarthy went back and forth between the Fidelity retirement specialists and the API managers about a dozen times in July and August 2008 is probative circumstantial evidence that the information was germane to her decision whether to retire. A rational juror therefore could conclude that McCarthy justifiably relied on API's misrepresentations when she signed the agreement.

McCarthy adduced sufficient evidence to create a genuine issue of material fact on each element of her fraudulent-inducement claim, and the district court erroneously awarded summary judgment to API.

**2.**

API also contends that McCarthy's fraudulent-inducement claim is preempted by ERISA, which preempts state-law claims that "relate to" an employee benefit plan as ERISA defines that term. 29 U.S.C. § 1144(a); *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1275 (6th Cir. 1991). "It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Cromwell*, 944 F.2d at 1276. McCarthy's fraudulent-inducement claim is not preempted by ERISA because she does not seek to recover an ERISA plan benefit; rather, she seeks damages for injuries allegedly incurred when API induced her to work from August 2008 until May 2009. Arguably, had she known she was entitled to post-retirement medical benefits as of August 15, 2008, she would have retired that same day, taking with her the lump-sum severance payment guaranteed to her by the CBA. Instead she worked for another nine months while receiving periodic payments equal to the lump-sum termination payment she allegedly should have received in August 2008. The damages she now seeks are not a plan benefit but rather fair compensation for the work she performed between August 2008 and May 2009.

**B.**

We turn next to the discrimination claims at the heart of McCarthy's original complaint. McCarthy alleges that age and sex discrimination motivated API's decision to terminate her position in August 2008. Although these are two separate claims under the ADEA and Title

VII,[4] the theory underlying each claim is identical, and McCarthy uses substantially the same evidence to support both claims. The claims therefore are examined in tandem.

To establish a *prima facie* case of disparate treatment without the benefit of direct evidence of the employer's discriminatory motives, an employee must show that (1) she is a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). In workforce reduction cases such as this, the fourth element is modified and the plaintiff "must provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998)).

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The burden of production then shifts back to the plaintiff to "establish that the legitimate reasons offered by the defendant were just a pretext for decisions actually motivated by an unlawful bias against age" or sex. *Id.* Pretext is shown with evidence that the proffered reason (1) has no basis in fact, (2) did not actually motivate the adverse employment action, or (3) was insufficient to warrant the challenged conduct. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 704 (6th Cir. 2007).

The district court held that McCarthy failed to meet each of her burdens: She did not adduce evidence of the fourth element of her *prima facie* case, nor did she adduce evidence of pretext. The same evidence is germane to each inquiry. The discrimination claims turn on whether API terminated McCarthy's position in accordance with the CBA—or, at the least, its interpretation of the CBA. Because undisputed evidence shows that API managers thought they

---

[4]McCarthy also alleges a sex-discrimination claim under Ohio law. Because the elements of an Ohio sex-discrimination claim mirror the elements of a claim under Title VII, we analyze the state and federal claims together. *See Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000).

were complying with the CBA when they terminated McCarthy's position, API has established a legitimate, non-pretextual basis for her termination.

McCarthy explains that API did not comply with the CBA when its management chose to terminate her position. We need not scrutinize the CBA because adjudication of McCarthy's discrimination claims does not require us to interpret that rather unclear document. The question we ask is whether McCarthy has adduced evidence that API "singled her out" for impermissible reasons, *see Rowan*, 360 F.3d at 547, or, stated in the language of pretext, whether the CBA "did not actually motivate" API's decision to terminate McCarthy's position, *see Clay*, 501 F.3d at 704. McCarthy has not identified evidence to support either conclusion.

Gary Winkler testified that the decision to implement a force adjustment came from senior management at API's corporate headquarters in St. Louis. The corporate office determined the number of positions to be terminated within each departmental unit and location. At the time this decision was made, the corporate decisionmakers in St. Louis did not know the identities of the affected employees; they simply instructed local managers to terminate certain positions, such as two PARs and one crew clerk. Local managers in the targeted office then implemented the directive by selecting the specific individuals to be laid off in accordance with API's interpretation of the CBA: The least senior employee who held the position targeted for elimination lost his or her job.

Winkler's uncontroverted testimony established that API followed this procedure when the company terminated McCarthy's position. McCarthy argues that the corporate office in St. Louis should have told the local managers in API's Dayton office to eliminate three Staff Associate III positions, rather than instructing the office to eliminate two PARs and one crew clerk. But that is a dispute with the interpretation of the CBA; it is not circumstantial evidence of API's discriminatory motive. At the time they decided to implement the 2008 force reduction, the senior managers who elected to eliminate two PAR positions in Dayton had no information about the age or sex of the two least senior PARs in that office. And Winkler's undisputed testimony established that API used these same procedures to determine which positions to eliminate in other offices, without regard to the age or sex of the persons occupying the position

slated for termination. McCarthy thus has not identified any evidence suggesting that API singled her out or that its proffered reason for terminating her position was pretextual.

McCarthy also adverts to API's 2008 decision to permit a PAR to replace a crew clerk when an extra crew clerk applied for the Interest in Leaving program. She contends that API "manipulated the procedures in the CBA by accepting more volunteers for early retirement than was contractually permitted." Again, that might be true, but that is a contractual dispute rather than a discrimination claim. The decision to accept an extra crew clerk into the Interest in Leaving program allowed API to save either McCarthy's or Saylor's job. Saylor outranked McCarthy, so Saylor was spared. Although McCarthy happened to be older than Saylor, McCarthy has identified no evidence suggesting that the decision to save Saylor's job was motivated by age rather than seniority. McCarthy's argument to the contrary is pure speculation. *See Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007).

We therefore affirm the district court's conclusion that McCarthy failed to adduce circumstantial evidence of intentional discrimination.

## C.

McCarthy next asserts an ERISA claim for failure to provide documents related to her retirement plan, in violation of 29 U.S.C. §§ 1024(b)(4), 1025(a), and 1132(c)(1). Neither party disputes that AT&T was the plan administrator and that the retirement plan is subject to ERISA's regulations. The district court awarded summary judgment to AT&T because the record evidence shows that McCarthy did not send a written request to the Plan Administrator at the proper address, as the relevant statutes require. We agree.

Section 1024(b)(4) states:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

Section 1025(a) provides that the plan administrator "shall furnish a pension benefit statement . . . upon written request to a plan beneficiary."

Section 1132(c)(1) imposes a penalty for failure to comply with those provisions:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. . . . [E]ach violation . . . shall be treated as a separate violation.

McCarthy alleges numerous unanswered requests for plan documents, most of which were made before AT&T was added as a party on July 11, 2011.[5]  First, in an October 2, 2009, letter from McCarthy's counsel to Piombo, counsel wrote: "Please allow this letter to serve as a second request on Kathleen's behalf for copies of all Plan documents, including the Berry Plan and any documents reflecting how employees should be grandfathered into that Plan, as well as documents relating to the current Plan."  McCarthy attached a copy of this letter to another letter, dated January 12, 2010, and addressed to AT&T's general counsel.

Further, McCarthy served API with numerous requests for the production of plan documents throughout this litigation.  On December 30, 2010, she asked API to produce

> [a]ll documents pertaining to any plan for retirement and/or retirement medical benefits, which have at any time applied to Kathleen McCarthy.  Please include in your response all summary plan descriptions and full plan documents.  Please also include within your response plans that related to The Berry Company, plans which referenced or applied the "Original Rule of 75," all documents which refer, relate, or constitute the "Berry Addendum," and any documents which refer or relate to a modification of the "Rule of 75."

In an April 27, 2011, request for production, she requested a copy of specific plan documents, including the documents on which Fidelity's retirement specialists relied when they told McCarthy that she was eligible to retire with post-retirement healthcare benefits.  McCarthy sent a substantially similar request for production to AT&T on July 29, 2011.

---

[5]The district court's opinion describes other alleged efforts by McCarthy to obtain these documents. McCarthy does not discuss those other requests in her brief and thus has forfeited any claim related to the requests.

AT&T did not comply with any of these requests, McCarthy claims, and in September 2011 she filed a motion to compel. In October 2011 a magistrate judge ordered AT&T to comply with the requests for production to the extent the company possessed the requested documents. The magistrate judge also instructed McCarthy to request the documents from the Fidelity Service Center. The defendants finally produced the documents in May 2012.

The district court held that the defendants did not violate ERISA because McCarthy did not direct her requests to the appropriate source. McCarthy received a January 2008 guide entitled "Where to Go for More Information: Contact Information for Employee Benefits Plans and Programs." That guide provides the address of an AT&T post office box in San Antonio, Texas, and directs plan participants to send requests for "copies of ERISA plan or program documents[,] or other documents under which an ERISA plan or program is established or operated," to that address. The guide also provides a different address, as well as a telephone number and web site, for plan participants seeking to obtain a summary plan description, a summary of material modifications, or a printed policy. Despite the clear instructions in this guide, McCarthy did not direct any of her requests to these addresses.

McCarthy's failure to direct her requests to the proper address is fatal to her claims under §§ 1024(b)(4) and 1025(a). In *Jones v. UOP*, a factually similar case, the Seventh Circuit held that requests for plan documents directed to the plaintiff's original employer, a wholly owned subsidiary of the plan administrator, did not trigger ERISA's disclosure requirements. 16 F.3d 141, 144 (7th Cir. 1994) ("The statute is plain: if a plan administrator is designated in the plan instrument, that is who has the statutory duty to respond to requests for information in timely fashion under threat of monetary penalty if he fails to do so."). The Seventh Circuit also refused to apply the ERISA disclosure requirements to requests sent to the wholly owned subsidiary's attorneys because those requests could be interpreted as being "in the nature of prelitigation jockeying and settlement negotiations." *Id.* at 145.

McCarthy directed most of her written requests for documents to API rather than AT&T. Because API was not the plan administrator, it is not liable under ERISA for its failure to provide the requested documents. *See id.* at 144. McCarthy did serve AT&T with one written request for production of the plan documents, but she did not send this request to the San Antonio post

office box identified in the January 2008 guide.  She served it on AT&T's lawyers.  As in *Jones*, the AT&T attorneys who received McCarthy's requests were entitled to assume that McCarthy simultaneously was seeking the information through the channels provided in AT&T's benefits guide.  *See id.* at 145.  McCarthy might ask the district court to reproach or sanction AT&T's attorneys if they refused to comply with a legitimate production request, but the appropriate vehicle for those sanctions is not ERISA's mandatory-disclosure provision.

*Minadeo v. ICI Paints*, 398 F.3d 751 (6th Cir. 2005), does not require a different result. *Minadeo* held that a plan administrator cannot ignore a written request for plan documents from an attorney representing the plan participant.  *Id.* at 758.  But the attorney in *Minadeo* sent the written request to the proper address—an address for the director of compensation and benefits at the plan administrator.  *Id.* at 759.  McCarthy's attorney, by contrast, sent her request to attorneys representing AT&T in this litigation, rather than to the AT&T benefits department.

McCarthy also requested the plan documents during several telephone calls with Fidelity retirement specialists whom she contacted through the AT&T Benefits Center—including the July 23 conference call in which Zawisa participated.  But these were oral requests for plan documents, and ERISA only penalizes a plan administrator's failure to respond to written requests.  *See* 29 U.S.C. §§ 1024(b)(4), 1025(a).  McCarthy argues that AT&T waived the enforcement of this statutory requirement because its benefits guide invited plan participants to request plan documents over the phone.  This is actually a question of estoppel rather than waiver, as there is no evidence that AT&T intentionally waived enforcement of the writing requirement.  In all events, McCarthy's argument fails on the facts.  AT&T's January 2008 guide clearly states that official requests for plan documents must be sent in writing to the San Antonio post office box.  Although the guide also invites plan participants to obtain information about the plans by calling the AT&T Benefits Center, the guide does not invite plan participants to request official plan documents over the phone.

**D.**

McCarthy next alleges that API failed to pay her any wages for the time she worked between August 15, 2008, and May 7, 2009, in violation of 29 U.S.C. § 206, the FLSA's minimum-wage requirement.  Although McCarthy concedes that API paid her 85% of her

normal wage rate during this period and further concedes that the 85% rate exceeded the federal minimum wage, she argues that the payments she received between August 2008 and May 2009 constituted a preexisting severance obligation rather than wages. Because her wages were paid from a preexisting obligation, she argues, API must compensate her for the hours she worked.

McCarthy's argument mischaracterizes the options that were available to her in August 2008. It is true, as she contends, that she was entitled to receive a termination payment of $38,770 if she elected to retire in August 2008. But according to the CBA, she was not entitled to receive healthcare benefits or to accrue service time for pension purposes if she elected to retire and take the termination payment. In the alternative, the CBA provided that she could enter the Employment Opportunity Pool, receive her termination payment over time rather than as a lump-sum payment, and continue to receive both healthcare benefits and pension credit. The choice was hers, and she chose the latter option. She therefore was not entitled to receive the full, lump-sum termination payment in August 2008 because she forwent that option. Nothing in the CBA—or any other contract—provides that McCarthy was entitled to a lump-sum termination payment if she elected to enter the Employment Opportunity Pool, and the payments that API made to McCarthy between August 2008 and May 2009 thus were not drawn from "an existing severance obligation or a set-off to a severance obligation," as she contends. To be sure, the evidence now shows that she could have received full healthcare benefits *and* an immediate, lump-sum termination payment had she chosen option one, but that simply means she made an unfortunate choice. McCarthy might be able to show that API fraudulently induced her to make the unfortunate choice, but she cannot import her fraud claim into a separate FLSA claim.

**E.**

McCarthy also advances a claim for promissory estoppel that mirrors her fraudulent-inducement claim. An Ohio plaintiff establishes a *bona fide* claim for promissory estoppel by showing "(1) a clear and unambiguous promise; (2) reliance upon the promise by the promisee; (3) reliance by the promisee that is both reasonable and foreseeable; and (4) injury to the promisee as a result of the reliance." *Commerce Benefits Grp., Inc. v. McKesson Corp.*, 326 F. App'x 369, 374 (6th Cir. 2009). The ostensible promise at the center of McCarthy's promissory-

estoppel claim is the same statement that underpins her fraudulent-inducement claim: API told McCarthy "that she was not eligible for retirement medical benefits in August 2008."

Both API and McCarthy argue from the premise that claims of "fraudulent inducement and promissory estoppel require proof of similar or identical elements." But there is a distinction between the two types of claims—a distinction that is significant here. To establish a claim for fraudulent inducement, the plaintiff need only show that the defendant made a false representation concerning a fact. *See Metro. Life Ins. Co.*, 646 N.E.2d at 532. A claim for promissory estoppel, by contrast, requires more: The plaintiff must establish that the defendant made a promise rather than a mere representation. *See Commerce Benefits Grp.*, 326 F. App'x at 374. The word "promise" connotes some sort of commitment on the part of the promissor. *See Dailey v. Craigmyle & Son Farms, LLC*, 894 N.E.2d 1301, 1307 (Ohio Ct. App. 2008) ("A promise is defined as 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" (quoting *Stull v. Combustion Eng'g, Inc.*, 595 N.E.2d 504, 507 (Ohio Ct. App. 1991))).

API's alleged statement that McCarthy was not eligible for post-retirement medical benefits in August 2008 undoubtedly constitutes a representation of fact. Statements of fact are not necessarily promises, however, and McCarthy has identified no evidence showing that API committed itself to a certain course of conduct. Indeed, the record evidence suggests that API could not have made any commitments or promises with respect to McCarthy's retirement eligibility because API delegated the administration of its retirement system to Fidelity and to Hewitt, which administered the program and ultimately made eligibility determinations. Pamphlets directed AT&T employees to contact Fidelity representatives for benefits information, and McCarthy and her supervisors engaged in numerous conversations with Fidelity retirement specialists to determine her eligibility for post-retirement healthcare benefits. Accordingly, API never committed itself to a certain course of conduct, and the district court properly awarded summary judgment to the defendants on McCarthy's promissory-estoppel claim.

**F.**

McCarthy also presents a claim for unjust enrichment. Because unjust enrichment is a quasi-contractual remedy, however, a plaintiff cannot recover for unjust enrichment when an

express contract governs the subject matter of the litigation.  *See Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009); *HAD Enters. v. Galloway*, 948 N.E.2d 473, 478 (Ohio Ct. App. 2011).  McCarthy seeks to recover unpaid wages accrued between August 2008 and May 2009, but during that period her employment relationship with API, including her wages, was governed by the Employment Opportunity Agreement.  Although McCarthy claims that she signed that contract under duress and in response to API's fraudulent inducement, she does not seek rescission of the agreement.  She only seeks damages.  The Employment Opportunity Agreement therefore remains in effect, whether or not API obtained her signature through duress or fraudulent inducement, and McCarthy's unjust-enrichment claim fails.

### III.

For these reasons, the decision of the district court is affirmed in part and reversed in part. McCarthy may present her fraudulent-inducement claim to a jury.  The district court properly awarded summary judgment to the defendants on each of the other claims.